BENJAMIN F. WHITE, plaintiff in error, vs. JOSEPH B. IVEY, defendant in error. BENJAMIN F. WHITE, plaintiff in error, vs. A. C. PEASE, Agent of J. T. REESE, defendant in error.

Impressments, to be legal, must be authorized and regulated by law.

In Equity in Dougherty Superior Court. Injunctions granted by Judge RICHARD H. CLARK, at Chambers, October 1864.

These two cases were argued together in the Supreme Court.

The facts in the first case, *White vs. Ivey,* were as follows: Ivey, in October 1864, exhibited his bill against White, praying an injunction, and alleging that he, the complainant, was by occupation a hotel keeper, and as such, had paid to the Confederate States his registration tax and other heavy taxes; that he had rented a hotel with twelve rooms, in the city of Albany, for a term which would not expire until the 1st of January 1865; that he had been at great labor and expense in furnishing the rooms, hiring servants, and procuring provisions, which would be almost wholly lost if he

were expelled from the house; that he had occupied it as a hotel since the first of January 1863, and was still so occupying it; that he and his family resided in it, and were dependent for their support upon its profits as a hotel; that he had no other occupation or means of livelihood, and that his expulsion from the house, at that time, would ruin him, and leave his family in the street, without a roof to shelter them. The bill further alleged, that there was but one other hotel in the city, and that it was not of sufficient size to accommodate all the traveling public; that the city was the terminus of two lines of stages and one railroad; that the schedules upon these were so arranged that a large proportion of the travelers were compelled to stop over in Albany; that these travelers were mostly officers, soldiers, and others connected with the public service, going to and returning from the armies in the field; and that their entertainment and accommodation was as much a *military necessity* as the establishment of hospitals for sick and wounded soldiers. The bill further alleged that there were in the city, buildings larger and more commodious than complainant's hotel, and better adapted to hospital purposes, some of which, if not all, were empty, could be used for such purposes, and might, as complainant believed, be procured if needed; and it pointed out, specifically, four churches, Tift's Hall, a large building formerly occupied as a wholesale grocery, and one formerly used as a livery stable. It alleged, further, that the complainant had been served with the following notice:

"OFFICE HOSPITAL Q. M., }
Albany, Ga., Oct. 12th, 1864. }

MR. IVEY—I am ordered by the post commandant to take possession of the house you now occupy, in the brick block, for hospital purposes. You are, therefore, notified to vacate said house, or give me possession, by Saturday the 15th instant.          F. A. STROOKY, Maj. and Q. M."

The bill alleged that the purpose of this notice was to impress the hotel, expel complainant's family, and destroy

his business, under the pretext of a military necessity; whereas, there was, in fact, no such necessity; and that the real design was not to make use of the hotel for hospital purposes, but as rooms for a large number of hospital surgeons and their families; that these surgeons had, a short time previously, solicited complainant to lease to them the rooms for their families to live in, and he having refused to do so, they had, as he believed, resorted to this compulsory method to carry out their own ends, thereby making a fraudulent use of the law.

The bill prayed for an injunction, to be directed to Captain White, the commandant of the post, and to his under officers, and all the surgeons in charge of hospitals at the post of Albany, restraining them from any further attempt to take possession of the premises, or to molest the complainant in the peaceable occupation thereof.

His Honor Judge Clark, to whom the bill was presented for sanction, passed an order calling upon the defendant to show cause why the injunction should not be granted.

The defendant, accordingly, answered the bill substantially as follows: He admits that complainant is using the premises as a hotel, but as to the amount of supplies or number of servants engaged, or as to whether it is complainant's only means of livelihood, he is not informed. He is informed that there are two other hotels in Albany, and he alleges that these, together with private boarding houses, would meet, in a great measure, the wants of the public. He has learned, and believes it to be true, that the ladies have a wayside hospital, at which soldiers traveling through the city are entertained free of expense, so that the hotel of complainant is not a military necessity. He admits that there are four churches and Tift's Hall, but states that the post surgeon expects to convert the latter into a hospital for patients suffering from gangrene wounds; and as to the former, he says they are small, would entertain but few patients, are without fire-places, and he has not the means to furnish a sufficient number of stoves to adapt them for winter quarters

for the sick.  He says, moreover, that they are remote
from one another, and none of them of sufficient capacity
for one hospital; that this, if it were otherwise practicable
to use them, would add vastly to the expense of keeping
them up; that it is indispensable the quarters for a hospital
should be contiguous, that the patients should be properly
provided with attention, nurses, etc.; that, besides, it would
require the removal of all the pews permanently fastened,
and otherwise seriously injure and deface the buildings; and
that it is shocking to the moral sense of the community for
churches to be thus appropriated, as well as contrary to the
policy of the Government, except in very extreme cases.
As to the grocery store mentioned in the bill, he says it is,
in part, already occupied as a hospital, and the balance of it,
doubtless, will be.  The livery stables, he learns, are filled
with produce, and are not at all adapted for hospitals, but
only for horses; in wet weather and during winter, it would
be inhuman and disgraceful to confine a wounded soldier in
such quarters.  He says there are located at Albany, six
hospitals of the Army of Tennessee, with furniture and
bedding sufficient for 2,400 persons; that with all the tents
the Government has been able to furnish, the buildings and
quarters occupied by these hospitals, afford capacity for only
600 persons; that if the buildings specified by complainant,
and all others in the city, similarly situated, were appropri-
ated, there would still be a great deficiency of quarters;
that he expects to be under the necessity of appropriating
the whole of them, but wishes to avoid it as long as possible.
He says the main reasons why it is necessary to have com-
plainant's hotel, are, that it will afford comfortable quarters
for sick soldiers, and is in the same block with the Direction
Hospital, and that to have the quarters of that hospital all
in the same block, would be a great saving of expense,
labor, and trouble.  He says a proposition in writing was
made to complainant to lease the hotel for the Direction Hos-
pital, at one hundred dollars per month, or if that rate of
compensation were unsatisfactory, to settle it by arbitration

in accordance with the Impressment Acts, which proposition the complainant refused.

He admits that the notice set forth in the bill was given in compliance with orders from him to the hospital quartermaster, but says it is not true, as charged, that it is contemplated to use the hotel for the surgeons or their wives, but that the same is to be used solely and exclusively for the entertainment of sick and wounded soldiers and their nurses. He declares it to be in express violation of orders, for a surgeon and his family to occupy hospital quarters, and says he would not allow any of the rooms to be occupied by anybody except the patients, nurses, and matrons of the hospital—these regulations the post surgeon, as well as himself, would see executed.  He believes the steps he has taken are not only legal, but absolutely necessary for the good of the army.  He learns that all the towns between Albany and the front, where it is practicable to establish hospitals, have already been occupied by hospitals, and that it is in contemplation to clear out all hospitals near the front, and send them to Albany and other remote points, so as to provide for the sick and wounded that may come from the front. He adds that large numbers will doubtless be transferred from the army of Virginia to these hospitals, and that it is, therefore, reasonable to suppose, so long as the hospitals are located at Albany, there will at all times be a large number to be provided for there.  He derives from Dr. Foster, Surgeon of the Post, and from surgeons in charge of hospitals, most of his information relative to the necessity of his action in this and other cases, and he refers to their affidavit as a part of his answer.  He copies, in his answer, as authority for his action, the following documents:

"OFFCE SURGEON IN CHARGE OF HOSPITALS, }
Albany, Ga., September 26th, 1864. }

*To S. H. Stout, Surgeon and Medical Director Hospitals, Macon, Georgia :*

SIR—I respectfully ask that authority be immediately obtained to impress such store houses and public buildings

in this place as may be absolutely necessary to the establishment of hospitals.

Very respectfully your obedient servant.

ROBERT C. FOSTER,
*Surgeon in Charge Hospitals.*

Endorsed thus:

"HEADQUARTERS POST,
Albany, Ga., September 27th 1864.

Approved and respectfully forwarded. The authority asked for is absolutely essential to obtain such buildings as are indispensable for hospital purposes.

B. F. WHITE, *Capt. com'd'g Post.*

O. M. D. HOSPITAL,
Macon, Ga., September 28th, 1864.

Respectfully forwarded to A. A. G., and asking for requested authority. S. M. BEMIS,
*Acting Medical Director.*

"HEADQUARTERS ARMY TENNESSEE,
October 5th, 1864.

"Respectfully returned. If, in the opinion of Major General Howell Cobb, commanding the district of Georgia, the impressment is necessary, authority is granted. By command of General Hood. E. J. HANER,
*Colonel and Inspector General.*

MED. DIR. OFFICE,
In the field, Oct. 5th, 1864.

Respectfully returned to Surgeon Stout. See indorsement of Inspector General. A. J. TODD,
*Medical Director.*"

"HEADQUARTERS POST,
Albany, Ga., Oct. 3d,* 1864.

*To Maj. Lamar Cobb, A. A. Gen. District of Georgia:*

"MAJOR—I have the honor to apply through you to the

---

* So in the Record, but doubtless an error.—REP.

General commanding District Georgia, for authority to impress such store houses and public buildings as are indispensable for hospital purposes at this post.　　*　　*　　*

.Respectfully your obedient servant,

B. F. WHITE, *Capt. com'd'g Post.*"

" Captain B. F. White, commanding Post at Albany, Ga., is authorized and directed to impress such stores and houses as are indispensably necessary for hospital purposes.　October 9th, 1864.

HOWELL COBB,

*Major General Commanding.*"

" OFFICE OF MEDICAL DIRECTOR OF HOSPITALS, }
Columbus, Oct. 10th, 1864. }

" Having been compelled, in consequence of proximity of the enemy, to remove the hospitals from Griffin to Albany, the impressment of buildings in the latter place has become a public necessity.

S. H. STOUT,

*Medical Director.*

The affidavit referred to in the answer, was prepared originally for Dr. Foster alone, but the statements and opinions therein expressed were concurred in, on oath, by Drs. Hill, Franklin, Pynchen, and Westmoreland, all of them surgeons in charge of hospitals.　The affidavit is in substance as follows: The deponent is surgeon in charge of hospitals at Albany, and means have been placed at his disposal to establish hospital accommodation for as many as 2,400 men, sick and wounded soldiers in the army of the Confederate States; the tents and buildings in his possession will not now accommodate more than 600 men; he has authority, herewith submitted to the Court, to procure buildings for the sick and wounded that may be sent to this post; acting under the same, he made a requisition for the buildings in dispute, they being, in his estimation, the most suitable buildings in the place for such purposes; if he is required to accommodate 1000 more persons; it will

take not only these, but every other available building in the town, including the churches and other buildings mentioned in the various bills filed in favor of J. B. Ivey and others against the Commandant of the Post; he is confident this additional number of patients, at least, will be sent to the Post for treatment, because he is well aware that all villages and towns along the route from the army of Tennessee are already filled with hospitals; many of these hospitals are being removed further to the rear on account of the difficulty of procuring supplies, and the danger of incursions from the enemy; the Government is short of transportation, and the policy is, to empty the hospitals in the front, and carry patients to the rear, where provisions can be supplied them without transportation, thus increasing the supply for the army in the field, and furnishing the hospitals more bountifully. It is usual when an engagement is anticipated, to remove all such as can be removed from the hospitals in front to those in the rear, for the purpose of making room for the seriously wounded in such engagements; the position of the army is such that an engagement may take place at any moment; and after a heavy engagement or a long campaign, all the hospitals in this department are usually filled to their utmost capacity. He states that Tift's hall will be used as a hospital for gangrene patients, who, for successful treatment of their malady, and to prevent it from spreading, require to be segregated from others; that the other buildings mentioned in the bills of complainants, have not, as yet, been impressed, because there are others more suitable, but preliminary steps will be taken to procure them for the public use; that even if they are not suited for hospitals during all seasons of the year, they may be used and will be required for hospital attendants and as store houses; that the six hospitals ordered to the post have an aggregate capacity of about 2,400 beds; that the whole of them will be needed at some early period; and that he is instructed to have them ready by the 15th of this month, (October 1864,) or as early as possible thereafter. He states that it is a matter of great

25

importance, both with a view to the economy of material and labor, and to the comfort of the patients, to have each hospital with all its departments as compactly arranged as possible, and that whenever buildings can be secured in proximity, they are, for these reasons, other things being equal, preferable ; that the brick buildings in question are thought, in their construction and relative position, most suitable for the accommodation of the sick and wounded, of any in the city; that their being taken will not obviate the necessity for the use of others not so well suited to the purpose; that it is expected by those in authority, as an act of simple justice to those who, in defending others, have become unable to defend themselves, that whenever buildings are selected for the use of sick and wounded soldiers, they shall be such as are best suited to the purpose, and not shanties or stables, or such other tenements as mercenary, unpatriotic, and unfeeling people may choose to force upon them ; and that officers making the selection, when opposed by public opinion or private interest, are required to proceed in such manner as will most effectually secure the objects of their orders, consistently with the laws of the land and a just respect to the civil authorities.

The complainant, in support of his bill, submitted the affidavits of sixteen persons, residents of Albany and acquainted with its buildings ; most of whom deposed that there were buildings in the city better adapted to hospital purposes, in situation, size, commodiousness, and means of ventillation, than complainant's hotel. Many of the affidavits, in particularizing these houses, pointed out those mentioned in the bill, and added to them two others, the " Striped store " and " Rawson's corner." Among the affiants whose opinions were most strong and decided in giving preference to all the specified houses, were three resident physicians, Drs. Davis, Parks, and Hardwick.

Judge Clark, upon the bill, answer, and affidavits, ordered the injunction to issue as prayed for.

The other case, *White vs. Pease*, was a similar bill by Pease as agent of J. T. Reese, a druggist, seeking to enjoin White, as commandant of the post, from impressing a tenement occupied by complainant as a drug store. This store, it seems, was in the same block with Ivey's hotel, and the effort to procure it was in prosecution of a general design to get possession of the entire block. The affidavits in the foregoing case, as well those read by complainant, as that of Dr. Foster, concurred in by the hospital surgeons, were applicable also to the premises brought into controversy by this bill; and a duplicate of all these affidavits is contained in the record of the present case.

Judge Clark took the same action in this, as in the preceding case, passing first an order to show cause, and then, after hearing both parties, ordering the injunction to issue as prayed for.

The bill alleged that complainant had the drug store under rent, and had fitted it up for business, and arranged his goods in it, after a great deal of labor and expense; that to have to remove to any other store would be attended with great damage and expense, in insurance, breakage, etc., more than the Government, under the circumstances, ought to be required to pay: that he believed no other store could be found in the city as well suited and fitted for his business; that although there were two other drug stores in the city, each of them had different drugs from the other, and such as they had, complainant might not have, and such as he had, they might not have; that therefore, and on account of the difficulty of procuring drugs, all the three stores were necessary for the accommodation of the public. The bill further alleged that defendant was about to take possession of the store and eject complainant therefrom, and had caused to be served on him this notice:

"OFFICE HOSPITAL Q. M., }
Albany, Ga., Oct. 12th, 1864.  }

DR. REESE: I am ordered by the Post Commandant, to take possession of the store you now occupy in the brick block,

for hospital purposes. You are, therefore, notified to vacate said room and give me possession by Saturday, the 15th inst.

F. A. STROCKEY, Maj. & Q. M."

That this notice was not accompanied with any offer to pay or liquidate the damages and rent, but with a promise of another room; that the promised room was on the opposite side of the street, and could not be as well fitted up for the complainant's business as the store he already occupied; that even if it could be made to answer the purpose, the defendant's right to control it was not apparent to complainant; that conceding such right, the fitting it up with shelves, drawers, and other things for the drug business, would be attended with great delay, expense, and loss of trade, for none of which had any compensation been offered; that complainant was informed, and believed that there were plenty of other buildings, larger, more convenient, and better adapted for hospitals than the one occupied by him—the four churches, three large buildings on Jackson street, Tift's Hall, and Rawson's store; that most of these were empty, more remote from the noise, bustle and business of the city, more roomy, and not cut up into so many apartments; that complainant was informed and believed that the object of securing the building in dispute, was not that it was better adapted for hospitals and hospital purposes, but because it had rooms suitable for occupation by families; and because the surgeons wanted these rooms for themselves and families; that it was not a military necessity, but simply a convenience and comfort to the surgeons, their wives and families; that complainant's store-room did not have capacity for more than twenty-five bunks, nor did any of the four other store-rooms in the same block; and that none of them were sufficiently ventillated for the purposes of hospitals.

The bill alleged that the hospital for which the impressment was threatened had been in the city some three weeks, and had had ample time and means for erecting any buildings that were necessary. It prayed that the defendant, his aiders and abettors, be restrained by injunction from taking

possession of the premises, and from interfering with the possession of complainant.

The answer, besides referring to and adopting the affidavit of the surgeons, as set out in the preceding case, states that complainant's drug store, as defendant is informed and believes, has been but recently established in Albany, and there are two others there, established prior to the year 1860, sufficient and full able to supply the county with drugs. Defendant does not know whether these stores have the same or different drugs; he suggests that if it takes the whole three to make up an assortment, they had best consolidate their stocks, and occupy one house. He admits that complainant may have rented the room, and had it fitted up for his business at expense and labor, as charged. He says he does not know what damage or expense, if any, would be incurred by removal to another store, nor whether another store suitable for the business, or any store at all, could be procured.

He admits that the notice set forth in the bill was given by his order, and that there may not have been any tender of compensation at that time; he thinks it unnecessary that there should have been, so that a tender be made before appropriation; and he avers that it was made and refused; that the sum of one hundred dollars per month was tendered and refused; that defendant offered to determine the question of compensation under the act of Congress regulating impressments, and this also was refused; and that another room was tendered to complainant, which was refused likewise. He denies that he failed to offer compensation for damages, and asserts that he did make the offer, and he now repeats it, and is willing to compensate for every damage known to, or recognised by the act of Congress regulating impressments. He denies that this impressment is for the convenience of the surgeons and their families, or that it is not a military necessity; he asserts on the contrary, that it is a military necessity. He denies that there are plenty of houses larger, more convenient, or better adapted to hospital purposes, and

declares the contrary to be the truth.   He admits there are
four churches, but submits to the Court whether it is better
to deprive the whole community of religious worship than to
discommode one individual.   He says Tift's Hall will be ap-
propriated to gangrene cases, and denies that it is as conveni-
ent or capacious as the building of which complainant's store
forms a part.   He denies that Rawson's store is suitable for
hospital purposes, and says it is occupied by the qartermas-
ter's or commissary's department.   He does not know whether
most of the houses mentioned in the bill are empty or not,
but he denies that they are better adapted to hospital pur-
poses.   He does not know how many bunks complainant's
room will accommodate, but does know that by taking the
entire block, as he is trying to do, he will be able to take
care of a greater number of patients there than in any other
building in the city.   He says it may be true, as charg-
ed, that the hospitals have been in the city three weeks;
but he denies that they have had time or means to build the
necessary houses.   He avers that it is impossible for them to
procure either the means or the material for building, and
says if they had both, that it would still have been impossi-
ble for them to have built the requisite houses.

HALL, for plaintiffs in error.

BAILEY, for defendants.

LYON, J.

We concur in the judgment of the Court below, in order-
ing an injunction against the seizure of these buildings
by the officers of the Confederate Government; and we rest
our affirmance of that judgment on the ground that such
seizures were not authorized by the acts of the Confederate
Congress allowing impressment of the property of citizens for
public use.

The act of Congress relied upon to justify this seizure, is

that of March 26th, 1863. The first section of that act provides, "That whenever the exigencies of any army in the field are such as to make impressment of forage, articles of subsistence, or other property, absolutely necessary, then such impressment may be made," etc. If the authority is conferred at all, it is by this clause of that act, and under the general expression "or other property." But we are clear that this does not confer such authority, and that Congress did not intend that it should. The terms, "other property," were not intended to cover real estate and all other property; but they were used in a much more limited sense, to signify that kind of personal or perishable property answering to that kind of property actually specified in the act, and absolutely necessary for the army in the field. We arrive at this conclusion, not only from an application of the general rule to this clause, that an enumeration of one class, or grade, of persons or things, followed by such general expressions as this, does not include other persons or things of a different grade, or class, without other and more particular reference thereto, but from a careful consideration of the other parts of said act. Thus, in the clause immediately following the one I have quoted, and from which the authority is claimed, we find this expression : "In cases where the owner of *such* property and the impressing officer cannot agree upon the value, it shall be the duty of such impressing officer, upon an affidavit in writing of the owner of such property, or his agent, that *such property* was *grown, raised, or produced* by such owner, or is held or has been purchased by him, not for sale or speculation, but for his *own use* or *consumption*, to cause the same," etc. By the terms, "such property," Congress intended to embrace all the property authorized by the preceding clause to be seized ; and in defining them again, they are referred to as signifying property grown, raised or produced—having reference particularly to provisions, forage or supplies for the army, (the fruits of the earth and of the industry of man—not the earth itself,) and exempting from seizure such as was necessary for the use and consumption of the

owner. Section 7th provides that "The property necessary for the support of the owner and his family, and to carry on his ordinary agricultural and mechanical business, shall not be taken or impressed." The act of 16th February 1864, amendatory of that of 26th March 1863, requires compensation to be made at the time of seizure, and exempts certain negroes from impressment that were subject to it by the first act; and these are all the acts on the subject, to which our attention has been called. Not one word is said in one of them, as to the seizure of lands or buildings of any kind, or for any purpose. Surely, if Congress was so careful of the rights of the citizen as to prohibit the seizure of any supplies necessary for his support, or to be used by himself, or of that which was necessary to carry on his ordinary agricultural and mechanical business; they would have been equally careful to prohibit, not only the seizure of his residence and place of business, but to protect him and his family from being turned out of doors, as was attempted in this case, even if authority had been given to seize houses and lands. At all events, this Court must have a plainer expression of an intention to confer such extraordinary powers on an officer, before we could sanction such acts.