WELLS FARGO & CO. v. MAYOR AND ALDERMEN OF JERSEY CITY.

(District Court, D. New Jersey. September 5, 1913.)

1. STATUTES (§ 208*)—RULES OF CONSTRUCTION.

Absurd or unjust results will never be ascribed to the Legislature, and it will not be presumed to have used inconsistent provisions as to the same subject in the immediate context.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 285; Dec. Dig. § 208.*]

2. COUNTIES (§ 148*)—MUNICIPAL CORPORATIONS (§ 740*)—LIABILITY FOR INJURY BY RIOTERS—CONSTRUCTION OF STATUTE.

Under Revision N. J. 1877, p. 998 (4 Comp. St. N. J. 1910, p. 4380), section 5 of "An act to prevent routs, riots and tumultuous assemblies," which provides that, "whenever any buildings or other real or personal property shall be destroyed or injured, in consequence of any mob or riot, the city in which the same shall occur, or if not in a city, then the county in which such property was situated, shall be liable to an action by or on behalf of the party whose property was thus destroyed or injured, for the damages sustained by reason thereof," the physical situs of the property destroyed or injured, and not the place where the mob originated or operated, fixes the liability of the city or county.

[Ed. Note.—For other cases, see Counties, Cent. Dig. § 213; Dec. Dig. § 148;* Municipal Corporations, Cent. Dig. §§ 1558, 1559; Dec. Dig. § 740.*]

3. COUNTIES (§ 148*)—MUNICIPAL CORPORATIONS (§ 740*)—LIABILITY FOR INJURY BY RIOTERS—CONSTRUCTION OF STATUTE—"PROPERTY."

Such act imposes a new liability on cities and counties, not recognized at the common law, and falls in the class requiring a strict construction; and under such rule the "property" for injury to which a right of action is given is limited to tangible property, and the liability does not extend to injury to a business.

[Ed. Note.—For other cases, see Counties, Cent. Dig. § 213; Dec. Dig. § 148;* Municipal Corporations, Cent. Dig. §§ 1558, 1559; Dec. Dig. § 740.*]

4. PROPERTY (§ 1*)—DEFINITION.

The word "property," literally taken, is nomen generalissimum but is not always so used. As ordinarily used it means the thing possessed,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

but it may include the right to use and enjoy it. The more comprehensive meaning is presumed to have been intended by the use of such a word in a constitution. In statutes the broader or restricted meaning will be given according to the legislative purpose.

[Ed. Note.—For other cases, see Property, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 6, pp. 5693–5728; vol. 8, pp. 7768–7770.]

5. PROPERTY (§ 2*)—BUSINESS—SITUS.

Property in its comprehensive sense undoubtedly embraces business, and so considered business undoubtedly has a situs. This situs, however, is not physical, but exists only in legal contemplation, and varies to accommodate the necessities of legislative purposes. Ordinarily, and in the absence of express statutory declaration, or unmistakable implication, fixing it at the place where the tangible property from the use of which it arises has its being, such situs follows the domicile of its owner.

[Ed. Note.—For other cases, see Property, Cent. Dig. § 2; Dec. Dig. § 2.*]

6. MUNICIPAL CORPORATIONS (§ 723½*) — INJURY BY RIOTERS — GROUNDS OF LIABILITY.

The taking of one man's property to contribute toward paying the losses sustained by the owner of another property in consequence of mob violence, by imposing liability on the city, finds its justification in the duty of protecting property situate within the city's limits, which the community owes to the owners of such property; but a statute imposing such liability absolutely, without regard to negligence, must be strictly construed.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1696; Dec. Dig. § 723½.*]

7. STATUTES (§ 218*) — CONSTRUCTION — CONTEMPORANEOUS CONSTRUCTION BY ACQUIESCENCE.

The general and continued acquiescence of both the legal profession and laymen in the assumption that statutes imposing liability on municipalities for the destruction of property by mob violence did not extend to business losses does not carry the force of judicial or legislative construction, but it is not without weight in the construction of a similar statute.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 294, 295; Dec. Dig. § 218.*]

8. WORDS AND PHRASES—"BUILDING."

The word "building" imports tangibility, and, while it is ordinarily classed as real property, it may be personal property.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 1, pp. 889–892; vol. 8, p. 7593.]

At Law. Action by Wells Fargo & Co. against the Mayor and Aldermen of Jersey City. Judgment for plaintiff.

Collins & Corbin, of Jersey City, N. J., and Charles W. Stockton and John H. Mooers, both of New York City, for plaintiff.

Warren Dixon, of Jersey City, N. J., for defendant.

RELLSTAB, District Judge. In an action to recover damages for property injured in consequence of mobs and riots, the case was submitted to the jury under special instructions. The jury found, in answer to the questions submitted, that the plaintiff had been damaged $300 in its tangible property and $43,000 in its intangible property—

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

its business. This business was collecting, transporting, and delivering merchandise, a general intrastate and interstate express business. In conducting that part of its business involved in this suit, the plaintiff used a pier on the Jersey City side of the Hudson river, a terminal of the Erie Railroad, as a receiving and distributing point. At this terminal it received not only the merchandise arriving on the trains but such as was collected in its metropolitan district, embracing the city of New York (excluding Brooklyn) and Jersey City, from which it forwarded on departing trains such as was intended for distant points and distributed that which was intended for delivery within such district. But a small, inconsiderable part of the business thus carried on had its origin or destination in Jersey City. In making such collections and distributions it employed a large number of men (drivers and helpers) and horses and wagons. These horses and wagons were housed in Jersey City, several blocks from such pier, and were taken by the employés in the early morning from the stables to the pier and returned thereto at the conclusion of the day's business. Mob interference with the passage of such wagons, etc., in the streets of Jersey City, from October 26 to November 14, 1910, occasioned the business losses which the jury's verdict fixed at $43,000. Whether the business losses thus sustained by the plaintiff can be recovered (the question reserved) depends upon the construction of the New Jersey act entitled "An act to prevent routs, riots and tumultuous assemblies." Rev. 1877, p. 978 (4 Comp. Stat. of N. J. p. 4380). The first four sections of this revised act, originally passed in 1797, denounce mobs, provide for their suppression and punishment, and declare the duty and immunity of the peace officers in dealing with them. The remaining sections are taken from the act entitled "An act to provide for compensating parties whose property may be injured or destroyed in consequence of mobs or riots," approved March 11, 1864 (P. L. 1864, p. 237), and concern themselves with the matter of such compensation. Sections 5 and 7, the pertinent sections, read as follows:

"5. That whenever any buildings or other real or personal property shall be destroyed or injured, in consequence of any mob or riot, the city in which the same shall occur, or if not in a city, then the county in which such property was situated, shall be liable to an action, by or in behalf of the party whose property was thus destroyed or injured, for the damages sustained by reason thereof."

"7. No person or corporation shall be entitled to recover in any such action if it shall appear upon the trial thereof that such destruction or injury of property was occasioned, or in any manner aided, sanctioned or permitted by the carelessness or negligence of such person or corporation; nor shall any person or corporation be entitled to recover any damages for any destruction or injury of property as aforesaid, unless such party shall have used all reasonable diligence to prevent such damage, and shall have notified the mayor of such city, or the sheriff of such county, immediately after being apprised of any threat or attempt to destroy or injure his or their property by any mob or riot of the facts brought to his knowledge; and upon the receipt of such notice it shall be the duty of such officer to take all legal means to protect the property attacked or threatened, and the expenses incurred by said officer in the performance of his duty as aforesaid shall be paid by the county collector of the county in which said property is situate, upon the approval of the judge of the court of common pleas of said county."

Generally stated, section 5 provides for compensating the owner of property destroyed or injured by mobs and declares who shall pay it; and section 7 imposes certain duties upon the owner of such property and upon the chief peace officers of the localities who are required to make such compensation. It is to be noted that in carrying out this legislative purpose of compensation the state places the obligation upon cities and counties, relieving itself and lesser political divisions.

[1] The plaintiff contends: First, that the following phrase in section 5, viz., "the city in which the same shall occur," discloses a legislative purpose to make the location of the mob violence, rather than the property destroyed or injured thereby, the deciding factor of the city's liability. This, in my opinion, is erroneous; and though, in the facts of this case, the city's general liability is the same whichever construction be accepted, as the mob violence was confined to such city, a determination of the proper application of this phrase (it being a relative one) will be helpful in ascertaining what kind of property was contemplated by this act. Under the plaintiff's construction, the result would be that if the mob operated from outside the city, and the property injured was within it, neither the city nor the county would be liable, for it is to be noted that the county's liability depends upon the situation of the property (outside the city) and not the place where the mob operated. It is apparent that such a result is foreign to the legislative purpose, which comprehends all property situate within the state. Absurd or unjust results will never be ascribed to the Legislature, and it will not be presumed to have used inconsistent provisions as to the same subject in the immediate context. The courts will be astute to avoid such results. Astuteness in ascertaining the legislative purpose and to harmonize its provisions therewith is not necessary, however, in this case. The legislative purpose in the quoted phrase and in the one immediately following is to limit the liability to cities and counties and to indicate when the city and when the county is to respond in damages. The Legislature having clearly indicated when the county shall be liable (if the property is outside the city), the same basis of liability (location of property) for cities will be taken as the legislative purpose, if the disputed phrase is sufficiently flexible to permit of such interpretation, even if another construction lies within the words used, as it is elementary in the interpretation of statutes that a meaning may be within the words literally yet not within the statute. Endlich Int. of Stat. § 25.

[2] The language employed in section 5 concerning the liability of city and county is only seemingly inconsistent, however. A careful reading of the entire section will evince that the basis of liability for both city and county is the same and that such basis is the location of the property injured or destroyed and not the origin of the mob violence. The word "same" in the quoted phrase, a relative term, is not limited in its application to the phrase "in consequence of any mob or riot" immediately preceding it. The phrase relative to mobs, it will be noted, follows two legislative expressions; the first relating to the destruction or injury of property and the other to the cause thereof. This phrase, though immediately preceding the disputed phrase, is not

its antecedent. The subject here is property, and the word "same" harks back to it, and the occurrence referred to in such phrase is the destruction or injury of property by mob violence. Property thus qualified (destroyed or injured by mobs) is the antecedent and such phrase, in view of the other parts of sections 5 and 7, must be read as referring to the location of such property and not to the occurrence of such violence in the city. In re Kimball, Fed. Cas. No. 7,768; Ammons v. Brunswick-Balke, etc., Co., 141 Fed. 570, 72 C. C. A. 614. That this is the proper construction to be given to this section is made plain by a reading of section 7.

In section 7 it will be noted that the owner of "the property attacked or threatened" is to give notice to "the mayor of such city or the sheriff of such county" "immediately after being apprised of any threat or attempt to destroy or injure his or their property by any mob or riot." Such city or county means the city or county referred to in section 5. If the mob which threatened or attempted to injure property located in Jersey City, but on the border of the city of Hoboken, had originated in Hoboken (parts of the same county), would the owner of the menaced property have discharged his statutory duty by simply giving notice to the mayor of Hoboken? Would not Jersey City have a perfect defense under this section upon proof that it had no knowledge of the existence of the mob in time to prevent the injury, etc., and that the owner, with knowledge of its existence and of its threats and attempts against his property, failed to give the statutory notice to the mayor of Jersey City?

What mayor is here meant "to take all legal means to protect the property attacked or threatened"? Undoubtedly the mayor of any city where a riot occurs is in duty bound to take available steps to suppress the riot; but, with reference to the peace officer here indicated to be notified by the property owner, is it not manifest that only such mayor is to act whose magistracy embraces the territory where the threatened property is located? What effective legal means could the mayor of any other city take that would protect the particular property threatened? The duty of such other magistrate would be the governmental one to suppress mobs irrespective of their particular destructive purpose; but the duty here enjoined is one to be performed in behalf of particular property; and manifestly only that mayor is intended within whose official territory such property is located. It is in that territory that such property is subject to taxation, and it is from the police authorities having particular charge of that locality that such property is entitled to protection.

Every consideration of these sections impels the interpretation that the physical situs of the property and not the place where the mob originated or operated fixes the liability of the city or county.

[3] Plaintiff's further contention is, as it must be to sustain the reserved finding of the jury, that intangible property of a most general character is comprehended in the phrase "buildings or other real or personal property." This can only be by assuming that the Legislature used the word "property" in its most general and comprehensive sense.

[4] The word "property," literally taken, is nomen generalissimum, but it is not always so used. As ordinarily used, it means the thing possessed, but it may include the right to use and enjoy it. The more comprehensive meaning is presumed to have been intended by the use of such a word in a constitution, as, being the organic instrument, it is presumed to have been couched in broader phrases than is the case in a statute, which usually concerns itself with more precise matters. In statutes the broader or restricted meaning will be given according to the legislative purpose. A consideration of the old law, the mischief to be remedied, and the character of the remedy (Lord Coke's rule) will also be helpful in determining whether words are to receive a literal, liberal, or restricted construction. The act in question imposed a new liability on cities and counties, one not recognized at the common law, and falls in the class requiring a strict construction. If the Legislature had intended to use it in its most comprehensive sense, it was singularly guilty of surplusage, for in such sense it was unnecessary to use the additional words "buildings or other real or personal" immediately preceding the word "property." Such additional terms qualify the meaning of property; and, unless they are to be discarded, they furnish strong evidence that "property" was used in a limited sense.

[8] The word "building" imports tangibility; and, while it is ordinarily classed as real property, it may be personal property. The words "or other real or personal property," following immediately such word "buildings," while more comprehensive, even if they are not controlled by the doctrine of "ejusdem generis," will be found to be restricted to tangible property when construed in the light of the context, the particular legislative purpose of the enactment, and the effects and consequences resulting if the broader meaning be given to them.

The English statute (1 George II. St. 2, c. 5), the prototype of the statutes in this country, shifting the loss of property sustained through mob violence from the individual to the whole community, used no general terms in designating the property to be compensated. It specified churches, buildings, dwelling houses, stables, and outhouses. Had it concluded with the general phrase "or other property," it is clear that under the cases such words would not have extended beyond subject ejusdem generis. While such canon of interpretation, being but an enlargement of the maxim "noscitur a sociis," is usually applied to instances where the general words follow several of a limited or restricted character, yet it is applicable where but one of the species is mentioned. Williams v. Golding, L. R. 1 C. P. 69. That many species are mentioned affords stronger evidence that the general words were intended to embrace only the same kind or character than when but one is used is undoubted, but the difference is only of degree. In the New Jersey act the word "building" comprehends all the species enumerated in the English statute. All of these are limited to corporeal or tangible property, and the general phrase following in our act, no more than if it had been similarly employed in the English statute, can be taken as comprising intangible or incorporeal property

without doing violence to accepted canons of interpretation. The rule that construes general words and phrases in the light of the company they keep, and which restricts their meaning to those immediately preceding and relating to the same subject, is one frequently employed to divine the legislative use of such words. The following cases, invoking such canon of interpretation, are some in which general terms relating to property were restricted to a sense analogous to the less general: Regina v. Neath, 6 Ad. & El., Q. B. 707; Regina v. Neville, 8 Ad. & El., Q. B. 452; East London Water Works Co. v. Mile End, 17 Ad. & El., Q. B. 511; People v. N. Y. & Mann. Beach Ry., 84 N. Y. 565; Renick v. Boyd, 99 Pa. 555, 44 Am. Rep. 124; Harwood v. Lowell, 4 Cush. (Mass.) 310; White v. Ivey, etc., 34 Ga. 186; Chidsey v. Canton, 17 Conn. 475. Under this doctrine only tangible property, real or personal, is within the New Jersey statute. The same result obtains, in my judgment, by the application of other accepted rules for the interpretation of statutes.

The entire phrase, "buildings or other real or personal property," naturally suggests to the mind tangible and not intangible property. Mr. Endlich, in the cited text-book, under the heads of "Ordinary Meaning Preferred," section 78, and "Restriction of General Words to Subject-Matter," section 86, said:

#### "Ordinary Meaning Preferred.

" * * * As between two meanings of a word, the ordinary and popular meaning is, in general, to be preferred and is most frequently in harmony with the subject-matter and object of the enactment."

#### "Restriction of General Words to Subject-Matter.

"But it is in the interpretation of general words and phrases that the principle of strictly adapting the meaning to the particular subject-matter, in reference to which the words are used, finds its most frequent application. However wide in the abstract, they are more or less elastic and admit of restriction or expansion to suit the subject-matter. While expressing truly enough all that the Legislature intended, they frequently express more, in their literal meaning and natural force; and it is necessary to give them the meaning which best suits the scope and object of the statute without extending to ground foreign to the intention. It is therefore a canon of interpretation that all words, if they be general and not express and precise, are to be restricted to the fitness of the matter. They are to be construed as particular, if the intention be particular; that is, they must be understood as used in reference to the subject-matter in the mind of the Legislature and strictly limited to it."

[5] The analysis made of sections 5 and 7, resulting in the conclusion that the location of the property determined whether the city or county was liable, shows that tangible and not intangible property was in the legislative mind. Buildings and other real property have a physical situs, and personal property of a tangible character, though movable, is capable of a like situs. Property in its comprehensive sense undoubtedly embraces business, the result or product of using tangible property. So considered, business undoubtedly has a situs. This situs, however, is not physical. It exists only in legal contemplation and varies to accommodate the necessities of legislative purposes. Ordinarily it follows the domicile of its owner; but legislative needs and purposes oft require that a situs other than the owner's domicile be

given to such property. The cases cited by plaintiff, from which I select The Slaughter House Cases, 83 U. S. (16 Wall.) 36, 21 L. Ed. 394, Adams Express Co. v. Ohio, 165 U. S. 194, 17 Sup. Ct. 305, 41 L. Ed. 683, Southern Pacific Co. v. Ky., 222 U. S. 63, 32 Sup. Ct. 13, 56 L. Ed. 96, illustrate this principle. These cases, however, are not helpful in this discussion. That business is property and that it may be taxable is conceded, and that some of that involved in this suit may be reached in this state by appropriate legislation and that the failure of the Legislature to subject business to taxation does not affect the question of its taxability may also be conceded and yet the defendant be immune from the burden here sought to be imposed upon it. The question pressing for solution is not whether such business may not be an appropriate subject of legislation for taxation or whether ethically it is not entitled to as much protection as tangible property but whether the Legislature has actually provided that such intangible property is to be compensated in case it is injured by mob violence. The situs of intangible property being a creature of the law, and the general rule being that it takes the situs of its owner, the business here in question must be held to have its situs in Colorado (the plaintiff being a corporation of that state), unless some statute by express declaration or unmistakable implication fixes it at the place where the tangible property from the use of which it has its being. No statute other than the one under consideration is claimed to give it such a situs, and, as this does not do so expressly, nothing short of an implication so clear and unmistakable as to exclude any other situs can take it out of the general rule.

[6] The enactment in question, as already mentioned, imposes a new obligation upon its political subdivisions. It subjects the property of individuals, taken collectively, to a burden unknown at the common law. Statutes in derogation of the common law must be strictly construed. This canon is well-nigh dogmatic and carries with it the presumption that the statute intended no further alteration in the common law than that which is clearly expressed. End. §§ 127, 341. And statutes which encroach upon the rights of the citizen, whether as regards persons or property, are similarly subject to a strict construction. End. §§ 340–345. The rule also applies to such statutes as authorize the taking of property for public purposes and a fortiori where the act subjects one man's property to seizure for the liability of another. End. § 343. It must be borne in mind that the city's liability under the act in question does not depend upon its negligence. The obligation to pay is absolute though the city did all in its power to suppress rioting and prevent property from being injured. The taking of one man's property to contribute toward paying the losses sustained by the owner of another property in consequence of mob violence finds its justification in the duty of protecting property situate within the city's limits which the community owes to the owners of such property.

In Chicago v. Sturges, 222 U. S. 313, 323, 32 Sup. Ct. 92, 93 (56 L. Ed. 215, Ann. Cas. 1913B, 1349), it was said:

"The policy of imposing liability upon a civil subdivision of government exercising delegated police power is familiar to every student of the common law. We find it recognized in the beginning of the police system of Anglo-Saxon people. Thus 'The Hundred,' a very early form of civil subdivision, was held answerable for robberies committed within the division. By a series of statutes, beginning possibly in 1285, in the statutes of Winchester (13 Edw. I, c. 1), coming on down to 27 Elizabeth, c. 13, the Riot Act of George I (1 Geo. I, St. 2), and Act of 8 George II, c. 16, we may find a continuous recognition of the principle that a civil subdivision intrusted with the duty of protecting property in its midst and with police power to discharge the function may be made answerable not only for negligence affirmatively shown but absolutely as not having afforded a protection adequate to the obligation."

"Property in its midst" is the expression here used by Mr. Justice Lurton. If the property damaged is not in the community's midst (that is, has not a physical situs in such city) but is of an intangible character consisting of the right to use tangible property in carrying on business such as that in question, and losses are sustained by the deprivation of such right (as are the losses in question), then, assuming that a saddling upon a community of such losses is not an infraction of the constitutional guaranty "of due process of law," it is the essence of accepted canons of interpretation of legislative declarations that such a burden can only be imposed by clear and unequivocal language, leaving no doubt that such was the legislative purpose.

Furthermore, when a passage is susceptible of more than one meaning, it is important to consider the effects and consequences which would result from a given construction. Endlich, § 113. This canon is not to be employed to avoid the clear import of a statute; but where the question is whether a word or phrase is used in its most comprehensive sense, and such sense would produce grave and serious results, such effects and consequences are to be given weighty consideration in arriving at the legislative intention. If the plaintiff's construction should prevail, dire disaster to the municipality might follow in the wake of every mob manifestation, regardless of the want of notice to the city or that it took every possible means to prevent the destruction or injury of property. The facts in the case at bar are sufficiently illustrative of the probable results following a like situation when made applicable to other transportation businesses. The cause of the plaintiff's business losses was due to a mob's endeavor to stop the passage of the plaintiff's horses and wagons to and from its stables. To the mind of the striking employés of another express company doing business in the same territory, a "tie-up" of the entire express business in such localities would be of advantage to them in enforcing the strikers' demands. Acting upon such theory, some of such striking employés, assisted by outsiders who sympathized with them, sought to induce the employés (drivers and helpers) of the plaintiff to abandon their horses and wagons. Not succeeding in this to the extent desired, they used force against such employés as continued in the plaintiff's employ and the "strike breakers" called in by it to help move such wagons; such force being applied indiscriminately to persons and property. With such an object lesson it is not fancy or mere speculation to conceive of a situation in Jersey City, the tide-water terminus of a number of transcontinental railway systems, where the business

of transportation of several, even all, of such railway lines would be seriously affected by mob violence following in the wake of a strike on one of such lines in consequence of an attempt upon the part of the strikers and their sympathizers to "tie up" the entire transportation business carried on in and through such city, resulting in business losses aggregating millions of dollars. Are such losses to fall upon the municipality? Yes, if the plaintiff's construction that all kinds of property are comprehended by such act. No, if the indemnity extends only to tangible property. Can it be that, merely because the statute used the word "property," the Legislature intended to burden its municipalities with all the injurious consequences resulting from the mob's interference with the use of tangible property? A construction fraught with such appalling consequences is not to be adopted unless the legislative intent that such is its purpose is clear and unmistakable.

[7] The New Jersey statute of 1864, as already indicated, has its prototype in Stat. 2, c. 5, 1 Geo. II, and similar statutes are found in a number of the states in this country. It is singular, if the plaintiff's contention is correct, though the reports show a number of successful actions brought to recover damages to property resulting from mob violence, that but one case (Palmer v. Concord, 48 N. H. 211, 97 Am. Dec. 605), can be found which holds that losses sustained by intangible property are recoverable under such a statute. It is inconceivable that business losses were not sustained in many of such cases, yet no mention of any claims or allowances for such losses is made in the reports, except in that case. The inference is justified: First, that in such case either no claim was made for such losses or that they were disallowed; and, second, that the legal profession, as well as laymen, in the several states wherein such riots destroyed and injured property from the time of such enactments acquiesced in the construction that business losses were not considered as property in such statutes. While such continued acquiescence does not carry the force of judicial or legislative construction, it is not without sanction on the principle underlying the rule that due weight is to be given to contemporaneous exposition and long professional usage following it. The New Hampshire case, which is claimed to be an authority on this point, held that business is property within such a statute. This case had no judgment under review. By a practice apparently in vogue in that state at that time, the charge of the trial court, though no verdict was reached because of the jury's disagreement, was being tested as to its correctness before a retrial should be had. Among a number of instructions given by the trial judge was one "that, if the plaintiff (the publisher of a local newspaper) was entitled to recover anything, he should recover for the damage resulting from the interruption or destruction of the plaintiff's business and for the injury to the good will of the paper." Considerable attention was given by the appellate court to some of the challenged instructions, but it disposed of this particular one as follows:

"The instructions as to damages should be qualified, by adding 'so far as such interruption and injury were the direct and natural results of the attack of the mob.'"

No authority or reason for such ruling was given. Whether a new trial was had and with what results does not appear. Whether in the juridical polity of such state such advisory opinion is a final adjudication of the questions propounded, though by subsequent development such questions were not necessary for decision, I am not advised. Giving the opinion thus rendered the effect of a decision, it is the only one that has been called to my attention, or which I have discovered by such research as, in the limited time permitted, I have been able to make, that holds that intangible property is a subject for indemnity under such a statute. A distinction is readily observable between the "business" before the New Hampshire court and that before me. That in the New Hampshire case, carrying on a local newspaper, as is inferable, was confined in the greater part, if not entirely, within the limits of the city, while very little, if any, of that, the loss of which is involved in the case at bar, could find place within the city. Another, and to my mind weightier, distinction is that the business losses in the New Hampshire case were capable of being due directly and solely to the stoppage of the newspaper publication resulting from the destruction or injury of tangible property there in question, while the losses here considered were due to the failure to collect and distribute merchandise, having its situs not in Jersey City but elsewhere; the losses not being due to any direct attack upon such merchandise but upon the men, horses, and wagons employed to transport it and which happened to have a physical situs in such city. The failure to carry on such business was therefore not due directly but indirectly in consequence of the attacks made upon the tangible property within Jersey City. It will be noted that the appellate court in the New Hampshire case was constrained, in affirming the instructions of the trial court "that a recovery could be had 'for the damages resulting from,'" etc., to add "so far as such interruption and injury were the direct and natural results of the attack of the mob." This addition, in my judgment, is significant and sufficient to create a doubt whether such court would have allowed damages of the character now under consideration as being either the direct or natural results of the mob's attack. But, be that as it may, I am constrained, for the reasons heretofore given, to hold that not the right to use a thing but the thing physically possessed is the property legislatively dealt with in the New Jersey statute, and that the business losses falling within the point reserved are not property within such statute.

Judgment may be entered for the plaintiff only for the sum of $300, with costs.