### Com. v. Brletic et al., Appellants.

Argued April 9, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Benjamin C. Sigal,* for appellant.

*James B. Ceris,* Assistant District Attorney, and with him *A. B. deCastrique,* District Attorney, for appellee.

Opinion by Parker, J., July 13, 1934:

The defendants, Dan Benning, John Kapusta, and Emma Brletic, were indicted for riot, affray, inciting to riot, and aggravated assault and battery and the defendant, Rudolph Verkovich, for assault and battery. They were all tried by one jury; the first three were convicted and sentenced for riot and aggravated assault and battery, and Verkovich was convicted and sentenced for aggravated assault and battery. This resulted in seven appeals which were argued together before this court and will be disposed of in one opinion.

The first complaints of the appellants involve the charge of the court and are directed to the definition

of riot as given in the charge, to the refusal of a verbal request at the close of the charge to charge further on the subject, and to a comment by the court to the effect that there was not much question but that there had been a riot at the point and on the day in question. The assignments of error covering these questions will be considered together.

The first assignment of error is to the following statement in the charge: "A riot, as charged in the first count in this indictment, is the tumultuous assembly, the tumultuous disturbance of the public peace by the unlawful assembly of three or more persons in the execution of some private object. If three or more persons so assemble together for an unlawful purpose, every man is guilty of all acts done in execution thereof, or contributing or tending to that purpose. If they meet for a lawful purpose and proceed to an unlawful act, it is riot, providing it resulted in a breach of the peace. If they meet for a lawful purpose, and proceed to an unlawful act, it is a riot, provided it results in a breach of the peace. And these three defendants are the only ones named in this indictment as participating in this riot. You will notice, a riot is a tumultuous disturbance of the peace by an unlawful assembly of three or more persons in the execution of some private object. It is a tumultuous disturbance of the public peace. 'Tumultuous' means a noisy, boisterous, violent disturbance of the public peace by an unlawful assembly of three or more persons in the execution of some private object. The Commonwealth does not contend that these defendants had not the right to peaceably picket this plant of the Wyckoff Drawn Steel Company. But if they went there with clubs in their hands, and if when certain of the workmen came there to work, someone yelled, 'Here they come, let's get them,' and then they all assembled together on that call and proceeded to

the commission of an unlawful act, with loud cries and cursing, and to the disturbance of the public peace, then every man that encouraged, aided, abetted or assisted or took part in any act which was done in the execution of their purpose, or which contributed or tended to the consummation of their purpose, is guilty of the crime of riot." After a reference to the testimony of both parties, the court further said: "So, there cannot be much question as we see it in this case but that there was a riot at this point in the early morning of October 5, 1933. The main question, or one of the main questions for you to determine is who participated in this riot and who participated in the aggravated assaults and batteries which are charged in these indictments." Prior to that time the court had carefully instructed the jury that they were to determine the facts; that they alone could do that; and that they alone could determine the guilt or innocence of the defendants.

The definition and description of a riot as given were not inconsistent with the common law definition. In an enumeration of offenses against the public peace, Blackstone includes riots which he defines as follows (IV. Bl. Com. 146): "Riots, routs, and unlawful assemblies must have three persons at least to constitute them ...... A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel; as, if they beat a man, or hunt and kill game in another's park, chase, warren, or liberty or do any other unlawful act with force and violence, or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner." The Act of March 31, 1860, P. L. 382, §19 (18 PS 551), prescribes the penalty for riot, rout, unlawful assembly, and affray, but does not define the offense of riot. While we have been unable to find a comprehensive definition of a riot by the appellate courts

of this state, the subject was considered in the case of Lycoming Fire Insurance Co. v. Schwenk, 95 Pa. 89, and in that of Com. v. Merrick, 65 Pa. Superior Ct. 482. We do not find anything in those cases inconsistent with the definition as given by Blackstone or as given by the court in this case.

For the purpose of determining the correctness of the instructions complained of and the duty of the court as to the field which should be covered, we will refer to the evidence. On October 5, 1933, there had been and was then a strike at several of the manufacturing plants in Ambridge, Beaver County, including that of Wyckoff Drawn Steel Company, and pickets were patrolling the streets adjoining the plants. At about 7:30 A. M. of that day, F. C. Peters, an electrician and employee of the Wyckoff Company, with several co-workers, according to the testimony of the Commonwealth, was about to enter the premises of that company and was stopped by Dan Benning, one of the defendants, who had a club in his hand. Peters started back across the street when someone yelled, "Get him." A crowd of fifty gathered around with clubs, one person with a brass rod and another with a potato masher, during which time there was cursing, swearing, and a "tumultuous noise." The Commonwealth's testimony also tended to show that all four defendants struck and beat Peters while he was on the ground until he was cut and bruised and his skull was fractured, and that all of the employees attempted to retreat from the plant, but Peters who was lame could not make progress and as a result was overtaken.

All of the defendants except Kapusta, to whose appeal we will refer later, admitted their presence at the time and place of the disturbance but denied any disorderly conduct or any part direct or indirect in the assault upon Peters. However, by their own ad-

missions and the testimony of their own witnesses, there was gathered at the point in question a tumultuous and unruly crowd, some members of which actually perpetrated an unlawful act of violence. It was not denied that there had been an unlawful act of violence, an aggravated assault and battery; that the crowd was unruly, tumultuous; that Peters and his companions were running away from a mob, and that he was set upon and beaten until his skull was fractured; but the defense was that none of the defendants took any part in either an unlawful gathering or an assault upon Peters. Such of the testimony as we have reviewed discloses that the court was clearly within its right in stating that in the opinion of the court there was a riot, having carefully explained to the jury that that did not mean that anyone of the defendants was a party to it. The defendants' witnesses had themselves detailed what was, in fact, a riot.

By the second assignment of error the defendants particularly urge that the court erred in not giving further instructions at the close of the charge when requested verbally to say that it was essential in the case of riot that terror be inspired. In Hawkins' Pleas of the Crown (6th Ed., p. 295), the author discusses the subject of riot and states: "However, it seems to be clearly agreed, that in every riot there must be some circumstances either of actual force or violence, or at least of an apparent tendency thereto, as are naturally apt to strike terror into the people; as the show of armour, threatening speeches, or turbulent gestures, for every such offense must be laid to be done in terrorem populi." It must be borne in mind that Blackstone, in his definition of riot, includes not only those acts where there is an unlawful act of violence, but the doing a lawful act, as removing a nuisance in a violent and tumultuous manner. In the

latter case it would be appropriate, and perhaps neces-
sary, to impress upon the jury the fact that there must
not only be a noise, but it must be to the terror of the
people. As Hawkins points out, actual force is natu-
rally apt to strike terror into the people. This dis-
tinction is pointed out in 54 C. J. 828, where it is said
that a riot may occur, "either in executing a lawful
private enterprise in a violent and turbulent manner,
to the terror of the people, or in executing an unlaw-
ful enterprise in a violent and turbulent manner."
It is the object and office of instructions to define for
the jury and to direct their attention to the legal
principles which apply to and cover the facts proved
or presumed in the case. There is not any duty upon
a court to instruct the jury as to legal principles which
are not involved or to enter into a general discussion
of all the ramifications of a principle of law when such
information will not assist the jury in performing the
immediate task they have in hand. Here the jury
would not have been assisted by a further disserta-
tion upon the subject of necessity for striking terror
in the hearts of peaceable citizens. Under the evi-
dence as admitted by the defendants by their own
testimony and that of their witnesses, such acts were
performed as would naturally strike terror. Again,
if the defendant was of the opinion that further in-
structions should have been given by the court, he
should, under the circumstances present here, have re-
duced his request to writing.

Complaint is also made of a part of the charge of
the court as follows: "One of our judges has said,
with regard to a riot and a tumultuous assembly: 'All
persons who are present and not actually assisting in
their suppression may, where their presence is inten-
tional, and where it tends to the encouragement of
the rioters, shall be prima facie inferred to be partici-
pants; and the obligation is cast upon a person so

circumstanced, and it must be his defense, to prove his actual noninterference.' '' This statement was made in the case of Com. v. Merrick, supra, p. 490, and was adopted by this court from Wharton's Criminal Law.

There is not any merit in the complaint as to the refusal of the court to allow a re-examination of the witness Keber. The district attorney had called the attention of the witness to an apparent contradiction in his testimony and had asked him for an explanation, and particularly inquired which of two statements by the witness were to be received. His reply was ''Whichever you want to.'' The identical matters had been covered on examination and cross-examination, and we will not convict the lower court of error in the exercise of discretion in these circumstances. It was for the trial court, who had heard the witness testify, to determine whether he should be turned over again for examination by the defendants on a matter already covered.

The next question raised is whether the defendants could be sentenced to the Allegheny County Workhouse. The defendants contend that the only proper imprisonment was in the county jail. By the Act of March 31, 1860, P. L. 382, §19 (18 PS 551), the penalty for riot is ''a fine not exceeding five hundred dollars, or undergo an imprisonment not exceeding two years, or both, or either, at the discretion of the court.'' This, under our decisions, is simple imprisonment which means in the county jail. It is only in the case of a conviction for an aggravated riot that the offender may be sentenced to imprisonment by separate or solitary confinement at labor. The Act of February 1, 1866, P. L. 8, is a supplement to the Act of March 23, 1865, and by that supplement it is provided: ''And thereafter, when any person, or persons, shall be convicted, in said court, of any offense, the punishment whereof,

by existing laws, is, or may be, imprisonment in the county jail, said court may sentence such person, or persons, to either said jail or workhouse, at its discretion.'' This matter has been considered by us and is ruled by the following cases where the same question involved was passed upon: Com. v. Zinkeris, 79 Pa. Superior Ct. 85; Com. v. Dudick, 88 Pa. Superior Ct. 87; Com. v. Jones, 90 Pa. Superior Ct. 489; and Com. v. Camwell, 91 Pa. Superior Ct. 540.

One of the assignments of error in the appeal of Emma Brletic concerned the admission of a photograph. This exhibit was a photograph published in a Pittsburgh paper showing Mrs. Brletic wearing a coat with a fur collar and holding a potato masher in her hand, talking to another woman who had a club in her hand. It is necessary to state the facts in order that we may appreciate the reason the trial court had for the ruling of which complaint is made. Mrs. Brletic admitted that she came upon the scene while Peters was still on the ground and that she had a potato masher in her hand. Her principal defense was that she had no part in the gathering or in the assault; that at the time of the disturbance she was preparing breakfast for her children and while making mashed potatoes for them for breakfast was called to the front of the house where she saw the disturbance; and that she then hurried out of the house without a coat and with the masher with which she had been working in her hand. On cross-examination a photograph from a current edition of a Pittsburgh paper was shown to her. She identified the picture as being one of herself and stated that it was taken thirty or thirty-five minutes after Peters was on the ground and that she still had the potato masher in her hand. When her attention was called to the fact that she was wearing a coat in the picture and that the other woman had a club in her hand, she then stated that she had been at

the Seamless Tube before, early in the morning, and that they had taken a picture of her there. The witness having admitted that the photograph described her appearance at about the time with which we are concerned and that she was wearing a coat when the photograph was taken played an important part in obtaining from her a further admission that she had the potato masher on the street early in the morning. The photograph was admitted for the very limited purpose of showing the dress worn by Mrs. Brletic and that if the photograph was taken, as she last said, an hour or an hour and a' half before the disturbance, she was then on the street with the masher, seriously affecting her credibility and contradicting her statement that the only reason she had the masher along was because she hurried out of the house while mashing potatoes. The jury needed the exhibit to understand the cross-examination. It was not error to receive the exhibit for the limited purpose for which it was received.

The defendant, John Kapusta, denied that he was present at the time when the trouble occurred and offered other evidence tending to prove an alibi. The trial court instructed the jury as to the burden of proof upon the Commonwealth to make out a case beyond a reasonable doubt and referred to the testimony of both Commonwealth and defendant bearing upon the question of the presence of Kapusta. He also instructed the jury generally on the subject of alibi, but failed to give any instruction whatever as to the quantum of proof required upon the part of the defendant to establish his alibi. This was clear error which requires a reversal of the judgments and the granting of a new trial as to the defendant John Kapusta. In the case of Com. v. Stein, 305 Pa. 567, 570, 572, 158 A. 563, where the precise question was raised, the Supreme Court said: ''The trial judge entirely neglected to instruct the jury that defendant

need prove her alibi only 'by a preponderance of the evidence,' or by 'satisfactory proof,' or by any other equivalent. Our cases uniformly hold that such an omission requires us to award a new trial ...... In view of defendant's right, even in the absence of a request for such instruction, to have the jury fully advised as to the burden of proof resting on defendant with respect to the alibi, and the difference of that burden from the burden resting upon the Commonwealth to establish guilt, and the failure of the trial judge to recognize this right when he undertook to charge on both the facts offered by the Commonwealth and the facts alleged to prove innocence by an alibi, offered by defendant, together with an explanation of the Commonwealth's burden of proof, we must hold that, in his failure to mention to the jury the important difference between that burden and the quantum required of defendant, he fell into error." In Com. v. Westley, 300 Pa. 16, 21, 150 A. 94, it was also said: " 'In reviewing the testimony of an alibi as arrayed against that of the Commonwealth showing guilt, the court should instruct the jury as to its nature, its purposes, and the degree of persuasion necessary to establish it': Com. v. Barrish, 297 Pa. 160. 'When an alibi is offered, the testimony to establish it may raise such a reasonable doubt as to entitle him to an acquittal': Ibid."

The judgments at Nos. 225, 226, 229, 230, and 231, April Term, 1934, are affirmed, and it is ordered that the defendants, Emma Brletic, Dan Benning, and Rudolph Verkovich, appear in the court below at such times as they may be there called and that they be by that court committed until they have respectively complied with the sentences, or part of the sentences, which had not been performed at the time the appeal in each case was made a supersedeas.

In the cases at Nos. 227 and 228, April Term, 1934, the judgments are reversed and new trials granted.