**PROVIDENCE WASHINGTON IN-
SURANCE COMPANY**

v.

**George W. ROMNEY, in his capacity as
the Secretary of Housing and Urban
Development.**

**Civ. A. No. 4996.**

United States District Court,
D. Rhode Island.

July 19, 1973.

428

John W. Kershaw, Providence, R. I., for plaintiff.

Lincoln C. Almond, U. S. Atty., R. I., Constance L. Messore, Asst. U. S. Atty. R. I., Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

This action stems from a contract of insurance entered into by the plaintiff and defendant pursuant to the Urban Property Protection and Reinsurance Act of 1968, 82 Stat. 556–66, 12 U.S.C. §§ 1749bbb–1749bbb–21. The plaintiff filed a claim under Section XV(2) of HUD's Standard Reinsurance Contract (1969–70). The propriety of the disallowance of the plaintiff's claim is the subject of this law suit.

Section 1749bbb–11(b)(2) of the cited Act gives this Court exclusive jurisdiction.

### Findings of Fact

The ever litigious inmates of the Adult Correctional Institution star once more in a court drama—not as movants in this suit but rather as the catalyst that gave rise to the damages for which the plaintiff seeks recovery.

At approximately 10:30 a.m. on May 23, 1969 while most of the inmates were out on maintenance details or at work in the various prison workshops, three prisoners set fire to the maximum security section by pushing a burning mop through a tiled ceiling. Within a half hour, the fire was discovered and immediately the fifty or so prisoners in their cells were evacuated.

The resulting blaze and extent of the damages required that all the inmates housed in the affected area be transported by bus to another section of the prison. To do this thirty policemen were called to the scene. The transfer was accomplished in orderly fashion without any attempted escapes or unruly incidents either with the prison population or the spectators from the surrounding area who had gathered to view the fire. The blaze was of considerable magnitude demanding maximum effort from the fire departments that had responded. However, it did not in any way endanger any of the civilian homes in the community surrounding the prison compound. To specifically relate to the policy terms discussed, infra, there is no evidence the fire was designed to incite other prisoners or any other people to commit similar acts of destruction nor does the record disclose any racial, political or religious overtones, or disturbance immediately prior to or after the incident.

The three arsonists committed this act in secret and after investigation were charged and brought to trial. Though they protested their innocence throughout the hearing, they were convicted of statutory burning and with a breach against the peace and dignity of the state.

After paying the state's claim for damages for which it was liable under its policy with the State of Rhode Island, the plaintiff filed a claim under its HUD Reinsurance Contract contending it came under the policy coverage which insured losses due to damages caused by riot or civil disorder.

### Conclusions of Law

Section XV(2) of the Standard Reinsurance Contract (1969–70), U.S. Department of Housing and Urban Development defines "riot" or "civil disorder" as used in the contract as follows:

"(2) 'riot' or 'civil disorder' means:

A. Any tumultuous disturbance of the public peace by three or more persons mutually assisting one another, or otherwise acting in concert, in the execution of a common purpose by the unlawful use of force and violence resulting in property damage of any kind;

.    .    .    .    .    .

C. Any unlawful and terroristic act or occurrence, apparently having civil disruption or civil disobedience as a primary motivation resulting in intentionally-caused property damage of any kind in the amount of $2000 or more which may reasonably be determined by the Reinsurer, on the basis of evidence submitted by the Company to have been under the circumstances, a form of civil disorder."

The plaintiff concedes the non-applicability of paragraph B; therefore, it was omitted and will not be discussed.

### Section A

Since the Act does not define "riot", we must look exclusively to the Standard Reinsurance Contract, Section XV(2) quoted *supra*. It sets forth a definition as understood under the common law which was well defined by the Superior Court of New Jersey in A & B Auto Stores of Jones St., Inc. v. City of New-

ark, 106 N.J.Super. 491, 256 A.2d 110 (1969). After considering historical common law definitions and precedents it stated:

"A distillation of all the definitions of a riot contained in past precedents leads this court to the conclusion that a riot is simply a *tumultuous disturbance of the peace* by a group of three or more persons having a *common purpose who act in concert* to accomplish their purpose *through force and violence.*" (emphasis added) Id. p. 116.

It follows that in order for the plaintiff to recover, it must establish a loss occasioned by a "tumultuous disturbance of the [public] peace" accomplished "through force and violence."

The litigants are not at odds as to the definition of "tumultuous disturbance" nor can it be disputed that it means, as the defendant urges in his brief (p. 7),

" '1. Commotion or agitation of a multitude, usually with great uproar and confusion of voices. 2. Turbulence with din. 3. Violent agitation of mind or feelings; a violent outburst.' WEBSTER'S NEW COLLEGIATE DICTIONARY 916 (1961 Ed.)."

"[A] riot is . . . a tumultuous disturbance of the public peace. 'Tumultuous' means a noisy, boisterous, violent disturbance of the public peace by an unlawful assembly of three or more persons in the execution of some private object." Commonwealth v. Brletic, 113 Pa.Super. 508, 511, 173 A. 686, 687 (Pa.1934).

■ However, the plaintiff "contends that the use of the word 'or' between the words 'riot' and 'civil disorder' enables the definition to be read as the definition of 'civil disorder.' " The Court finds the somewhat confused approach employed by the plaintiff an anomalous argument removed from the policy definitions. In electing "civil disorder" as the applicable alternative it reasons through an orbit of definitions concluding it all means nothing more than a

breach of the peace, that is, "tranquility enjoyed by members of a community" and that in this case the arrival of the fire engines, police and the general excitement surrounding the fire did, indeed, destroy this tranquility and therefore coverage exists. The plaintiff thus seeks to avoid the common law definition of riot. Such gymnastics may be "well founded in grammatical English and logic," as it argues, but would make a circus of decisional law refined through the process of precedential analysis.

■ In this case, the fire was started in stealth while most of the cells were empty. Applying the definition of "Webster" and *Brletic, supra*, there was no noisy, violent disturbance accompanying the act of starting the blaze nor was there any great uproar and confusion of voices. The coverage in this case is for damage caused by a "riot" or "civil disorder" as defined in the policy. The lack of a "tumultuous disturbance" in the setting of the fire takes the incident outside the definition of riot. As stated in International Wire Works v. Hanover Fire Insurance Co., 230 Wis. 72, 283 N. W. 292 (1939):

"Even though there is terror or disturbance at the time the damage is discovered, a crime committed secretly away from the public view is not a riot. No riot exists in the absence of publicity at the time of the violent or tumultuous acts." *Id.* at 293–294.

See also Salem Manufacturing Co. v. First American Fire Insurance Co., 111 F.2d 797 (9th Cir. 1940); Hartford Fire Insurance Co. v. War Eagle Coal Co., 295 F. 663 (4th Cir. 1926); Walter v. Northern Insurance Co., 370 Ill. 283, 18 N.E.2d 906 (1938).

It is nothing more than a variation on the same theme so often articulated in the precedents I have cited to hold that stealthy and secretive acts committed evasively rather than defiantly by three or more perpetrators without the knowledge or presence of constituted authority or the parties injured, absent the req-

uisite force or violence, do not constitute a riot. The measure of force or violence must be such as to extend beyond the mere mechanics of committing the act. It must reach the level of a defiant public expression to inflict injury or damage.

Here the action of the arsonists was a crime unaccompanied by any of the elements necessary to constitute a common law riot. The damage caused by the fire is not covered by Section XV(2)(A) of the Reinsurance Contract.

### Section C

For ease and continuity in reading, I repeat Section C:

> "C. Any unlawful and terroristic act or occurrence, apparently having civil disruption or civil disobedience as a primary motivation resulting in intentionally-caused property damage of any kind in the amount of $2000 or more which may reasonably be determined by the Reinsurer, on the basis of evidence submitted by the Company to have been under the circumstances, a form of civil disorder."

█ It seems clear that Section A is the expression of a Congressional purpose to cover damages caused by common law riot. However, in this section it intended to go further and also include " . . . losses resulting from riots and *civil disorder*." (emphasis added). The Committee stated:

> "It has been pointed out that there has *recently* been a pattern of losses from intentionally caused fire or other property damage which may or may not be connected in time or place to *riots or group activity*, but which could be determined to be a form of *civil disorder*. It is the view of the committee that losses of this nature might be considered by the Secretary when he issues regulations delineating the *precise scope* of losses *resulting* from riots or *civil disorders*." (emphasis added) House Report No. 1585, Committee on Banking and Currency, 90th Congress 2nd Session at p. 80.

The wording "riots and other civil commotion" is also found in the Act's Declaration of Purpose. 12 U.S.C. § 1749bbb. The end result is Section XV(2)(C) of the Standard Reinsurance Contract which now comes before the Court for initial interpretation. The wording of this particular section, absent the causal damage aspect, requires a factual finding of an "unlawful terroristic act or occurrence" and whether or not it was primarily intended to bring about civil disruption or civil disobedience resulting in a form of civil disorder.

The decipherment of this issue rests on the proper definition of "civil disorder." The naked words in themselves are no strangers in the lexicon of television and newspaper descriptives of the now more prevalent unlawful disruptive conduct of society. "Civil disobedience" and "civil disorder" in its interrelation is nothing more than a form of conduct progressing from the individualized disobedience of the law to a mass effort of force against authority. Civil disobedience is a refusal to obey the law and does not apply to efforts to use violence as a coercive measure against constituted authority. Civil disorder on the other hand is a conflict between the individual or individuals who seek to marshall strength against authority wherein such constituted authority must employ force to impose its will. Unlawful and terroristic acts are not necessary elements for such civil disorder. (For a magnificently succinct discussion see former Justice Abe Fortas' book, "Concerning Dissent and Civil Disobedience").

██ The section in question, however, specifically requires an "unlawful and terroristic act or occurrence" which in its full condign application means a "systematic use of terror as a means of coercion." Webster's New Collegiate Dictionary (1967). And "terror" as is commonly understood and puristically defined means "intense fear, frightening." Webster, *supra*. Applying this reasoning to Section C, it must be found

that such conduct not only occurred but also that it was the primary motivation which resulted in the intentionally caused property damage. I find the plaintiff has failed in its proof. The record is starved of any evidence establishing motivation on the part of the prisoners, nor do I find any agitated conduct on the part of the inmates or the surrounding populace who gathered to obviously satisfy a very human curiosity aroused by the blaze. In this case there were no injuries, escapes or opposition by the prisoners. On the contrary, they readily participated in a well controlled evacuation of the burning area. There were no terroristic acts or conflicts between the individuals and authority.

The plaintiff offers no authority to support its position. With all respect, its approach is another serpentine application of meanings which I do not find persuasive or as requiring a detailed analysis.

Suffice it to say it seems to rest on the word "apparently" that is, " . . . subsection (c) does not require absolute proof of the primary motivation behind violators. Rather the definition requires that 'apparently' the act was motivated by persons having civil disruption or civil disobedience as a primary motivation." The plaintiff argues that "apparently" is an ambiguous word and therefore the Court should strike from Section C the word "terroristic" and the phrase commencing "apparently" and ending at "motivation." "The plaintiff (further) contends that as used in subsection (c) the phrase 'civil disruption' means no more than violent breach of the public peace and phrase 'civil disobedience' means a refusal to obey a lawful public regulation or the deliberate breach of a public law or regulation. The intentional commission and conviction of a felony for statutory burning is civil disobedience in a broad sense. The burning of the ACI Maximum Security building with its consequent tumult is such civil disruption as the definition requires." Plaintiff's brief, p. 20.

To begin with I do not find there was any tumultuous disruption and certainly no disruption within the meaning set forth by the Court, *supra*. As for the plaintiff's position it would be supererogation in analysis of meaning to juxtapose its argument to the conclusions and finding of this Court and point out where it fails.

Judgment for the defendant.