106 N.J. Super. 491 (1969)
256 A.2d 110
A & B AUTO STORES OF JONES STREET, INC., A CORPORATION, ET AL., PLAINTIFFS,
v.
CITY OF NEWARK, DEFENDANT.
Superior Court of New Jersey, Law Division.
June 25, 1969.
*493 Messrs. Herman D. Michels, Samuel A. Gennet and Marvin A. Sachs argued the cause for plaintiffs (Messrs. Feuerstein & Sachs, Samuel A. Gennet, Lieb & Teich, Jung, Selikoff, Rathman & Dwyer, Lum, Biunno & Tompkins, Lamb, Blake, Hutchinson & Dunne, Sandles & Sandles, Shurkin, Hersh & Fershing, Skoloff & Wolfe, Herman D. Michels, and Zucker, Lowenstein, Gurney & Zucker, attorneys for committee representing plaintiffs in consolidated actions).
Mr. Norman N. Schiff argued the cause for defendant City of Newark (Mr. Philip E. Gordon, Corporation Counsel of the City of Newark, attorney).
LARNER, J.S.C.
This matter was tried before the court without a jury on issues of liability which could be appropriately decided as common questions of law and fact in the consolidated claims for property damage resulting from alleged riots in the City of Newark between July 12 and 17, 1967. Many of the legal issues were previously decided by this court in A & B Auto Stores, Inc. v. City of Newark, 103 N.J. Super. 559 (1968). This plenary trial was concerned with the evidential exploration of the two basic issues of liability against the city:
1. Is the city liable in common law negligence?
2. Was there a riot or riots within the contemplation of the statutory liability created by N.J.S. 2A:48-1?

I
The evidence pertaining to the negligence count pointed generally to the alleged failure of the Newark police to *494 undertake appropriate steps and preparations to control the disturbances in a more efficient manner. Among the deficiencies asserted by plaintiffs were the failure to provide and equip the police with riot equipment of various types, such as riot sticks, shotguns, chemical devices, tear gas, gas masks, and the like. In addition, there was some evidence of superficial or inadequate training of police personnel in riot control, the failure to assign sufficient police personnel to the riot areas, the failure to seek outside assistance at an appropriate time, the failure to ease tensions by community activities through the mayor and other officials, the failure to create adequate planning for riot control, and the inability of the police to prevent and control much of the damage and looting which took place during the hectic days of July 1967.
Without detailing the factual support for those allegations, it is evident that the crux of the negligence charge is bottomed upon the failure of the city to act in the respects outlined above to restrain the rioters and to prevent and deter them from causing the extensive damages and losses sustained by the plaintiffs.
Upon the presentation of all the evidence, the court granted a motion for judgment as a matter of law in favor of the city on the negligence count, and concluded that the failure of a municipality to prevent crimes, control mobs, apprehend criminals or prevent damage to property or persons encompasses a governmental function in the conduct of which the city is immune from common law tort liability. Prather v. City of Lexington, 52 Ky. 559 (Ct. App. 1852); Ward v. City of Louisville, 55 Ky. 184 (Ct. App. 1855); Western College, etc. v. Cleveland, 12 Ohio St. 375, 377 (Sup. Ct. 1861); Gianforte v. City of New Orleans, 61 F. 64, 66, 24 L.R.A. 592 (C.C.E.D. La. 1894); Marshall v. City of Buffalo, 50 App. Div. 149, 152, 64 N.Y.S. 411, 413 (App. Div. 1900); Kretchmar v. City of Atchison, 133 Kan. 198, 200, 299 P. 621, 622 (Sup. Ct. 1931); Shake v. Board of Commissioners of Sullivan County, 210 Ind. 61, 63, 1 *495 N.E.2d 132, 133 (Sup. Ct. 1936); 146 West 117th Street v. City of New York, 50 N.Y.S.2d 569, 570 (N.Y. City Ct. 1944); Mr. Paint Shop, Inc. v. City of Rochester, 44 Misc.2d 684, 685, 254 N.Y.S.2d 728, 730 (Sup. Ct. 1964); Hart's Food Stores v. City of Rochester, 44 Misc.2d 938, 939, 255 N.Y.S.2d 390, 391 (Sup. Ct. 1965); Jones v. County of Herkimer, 51 Misc.2d 130, 135, 272 N.Y.S.2d 925, 931 (Sup. Ct. 1966); Roy v. Hampton, 108 N.H. 51, 52, 266 A.2d 870, 871 (Sup. Ct. 1967).
Prior to adoption of the New Jersey Civil Riot Act (N.J.S.A. 2A:48-1 et seq.) it was settled law in New Jersey as in other states that a municipality was immune from tort liability for damage caused by mobs or riots. Wells Fargo & Co. v. Mayor, etc., of Jersey City, 207 F. 871, 878 (D.N.J. 1913), affirmed 219 F. 699, 700 (3 Cir. 1915), certiorari denied 239 U.S. 650, 36 S.Ct. 284, 60 L.Ed. 485 (1916).
It is for that reason that the Legislature acted to create liability to a limited extent where none had previously existed. And, in the ordinary course of events, it would be a matter of elementary logic to reach the conclusion that the creation of the statutory cause of action negates the existence of a common law cause of action founded in negligence. However, plaintiffs assert that the pre-1864 governmental immunity has been eroded to such a substantial extent in the modern development of municipal law in this State that the court should reexamine the defense without regard to the effect of the statute and the immunity law existing at the time of its adoption.
It is manifest, of course, that common law municipal immunity has fallen into disfavor and that the current legal trend is to treat the ordinary torts of municipalities and their agents in the same manner as those of private individuals and corporations. See B.W. King, Inc. v. Town of West New York, 49 N.J. 318 (1967); Jackson v. Hankinson, 51 N.J. 230 (1968); Bergen v. Koppenal, 97 N.J. Super. 265 (App. Div. 1967), affirmed as modified 52 N.J. 478 (1968).
*496 Nevertheless, despite this trend, our courts have recognized as a matter of policy and fairness the necessity to insulate municipalities from liability in certain areas of activity which involve the process of decision and policy-making at the legislative or administrative level. For example, the determination of how, when and where to deploy snow removal equipment and personnel is a function involving governmental discretion allocated to the judgment of the local authorities, and should not be reviewed by the courts in a tort damage suit. Amelchenko v. Borough of Freehold, 42 N.J. 541 (1964); Miehl v. Darpino, 53 N.J. 49 (1968). Similarly, the decisions of a municipality whether to remove a traffic light at an intersection, Hoy v. Capelli, 48 N.J. 81 (1966), or whether to create a road having a certain number of lanes or dividers or traffic lights or circles, Fitzgerald v. Palmer, 47 N.J. 106, 109 (1966), or whether to designate a street as a one-way thoroughfare Visidor Corp. v. Borough of Cliffside Park, 48 N.J. 214 (1966), certiorari denied 386 U.S. 972, 87 s. ct. 1166, 18 L.Ed.2d 132 (1967), fall into the category of activities in which municipalities are immune from tort liability.
It is, therefore, evident in this State that with regard to certain of its activities, a municipality should not be subject to tort liability regardless of how those activities are defined or labeled. In Amelchenko, supra, Justice Francis pointed out some of the reasons for the continuation of immunity in snow removal cases as follows:
"Moreover, when a street department is established, obviously the governing body determines the number of employees to be assigned to it and the amount of snow removal equipment to be purchased and made available for ordinary municipal needs. That determination is a matter of judgment committed under our system of government to the local authority and it should not be interfered with by the courts in a tort damage suit.
Moreover, establishment of a general method of handling snow-storms is a matter of planning. The decision adopting a procedure regulating when, where and in what order of priority the equipment and personnel are to be used in dealing with them is legislative or governmental in nature. Such decisions cannot be subject to review in *497 tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions. The extent and quality of governmental service to be furnished is a basic governmental policy decision. Public officials must be free to determine these questions without fear of liability either for themselves or for the public entity they represent. It cannot be a tort for government to govern." (42 N.J., at pp. 549-550)
A similar approach is expressed by Chief Justice Weintraub in Fitzgerald, supra:
"A private entrepeneur may readily be held for negligent omissions within the chosen ambit of his activity. But the area within which government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done. Rather there is a political discretion as to what ought to be done, as to priorities, and as to how much should be raised by taxes or borrowed to that end. If government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party. So if a road were constructed of a design imperiling the user, the issue of fault would present no novel problem. But whether a road should have four or six or eight lanes, or there should be dividers, or circles or jughandles for turns, or traffic lights, or traffic policemen, or a speed limit of 50 or 60 miles per hour  such matters involve discretion and revenue and are committed to the judgment of the legislative and executive branches. As to such matters, the question is whether a judge or jury could review the policy or political decisions involved without in effect taking over the responsibility and power of those other branches." (47 N.J., at p. 109)
The New York Court of Appeals reached the same conclusion in the leading case of Weiss v. Fote, 7 N.Y.2d 579, 585, 200 N.Y.S.2d 409, 413, 167 N.E.2d 63, 66 (1960), wherein Judge Fuld noted the following:
"To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally consisted and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts. Acceptance of this conclusion, far from effecting revival of the ancient shibboleth that `the king can do no wrong', serves only to give expression to the important and continuing need to preserve the pattern of distribution of governmental functions prescribed by constitution and statute." *498 See also Van Alstyne, "Governmental Tort Liability: A Decade of Change," 1966 U. Ill. L.F. 919, 975 (1966):
"The principal rationale of the new version articulates a felt need to prevent juries, or judges sitting as triers of fact, from passing judgment upon decisions made by public officials in areas of policy and discretion where, by law, fundamental responsibility for making such decisions has been vested in them. It seems clear that the notion of fault has diminished relevance in this context. Wholly arbitrary and capricious governmental action is rare, indeed; and it is difficult to discern how a lay jury can decide rationally, in the artificial environment of a civil trial, that a responsible public official or board acted negligently in making a particular discretionary decision which ultimately had tort consequences. Almost invariably, a reasonable man could have decided either way; the presence of discretion and judgment as elements in the decisional process necessarily implies choice between alternatives which are equally defensible as rational conclusions drawn from good faith evaluation of competing arguments and policies. Since a rational determination in this context is inconsistent with the fault concept which underlies most tort law, the `discretionary immunity' has strong appeal along traditional conceptual lines."
In the context of the asserted facets of negligence in this case, the City of Newark and its police department were faced with many decisions of governmental policy which cannot now be subjected to judicial review.
For example, whether the city should have purchased or used extraordinary riot equipment such as shotguns, riot sticks, chemical devices or tear gas depended on the exercise of discretion by the responsible officials to determine whether the budget and taxes should be increased to encompass the necessary expenditures involved, whether the presence or use of such equipment would effectively control the mobs or rather increase the tensions and violence, and whether the deployment of such tools of danger would result in a greater holocaust of injury and death to members of the public, innocent and otherwise. How can a fact finder, whether a judge or a jury, reach a sensible conclusion as to fault in this type of activity where the use of discretion and judgment defy analysis under the accepted standards of reasonably prudent conduct?
*499 In the same vein, how is it possible to test the reasonableness of the actions of the police administration in the deployment of police to the riot areas when they are faced with the limitation of personnel within budget requirements and available recruits, and with the necessity to utilize the police force in all parts of the city for ordinary police duties involving traffic, investigation and detection of crimes, arrests and general protection of the members of the public?
Or who is to say that the mayor of the city was negligent in failing to ask for assistance from the State before he did, when his decision involves such complex determinants as the reaction of the public and the rioters to a state of military siege? And how is a fact finder to arrive at a determination of fault or cause and effect in such nebulous areas as riot training or planning or community relations between city officials and militant racial groups?
It is abundantly clear that the ambit of activity encompassed herein involves areas of discretion and policy committed to the judgment of the legislative and executive branches of the local government and beyond the pale of appropriate judicial review.
The dismissal of the negligence count is further dictated by the absence of expert testimony to establish the standard of conduct applicable to the Newark police under the existing factual circumstances. The nature of police administration dealing with the judgment of those engaged in a field of professional expertise is beyond the ken of fact-finding laymen, such as jurors or judges. In such an area, expert testimony is necessary to establish the basic standard of conduct of a reasonably prudent head of a police department faced with the panorama of existing facts before a fact-finder can determine whether negligent conduct is demonstrated. Cf. Carbone v. Warburton, 22 N.J. Super. 5, 10 (App. Div. 1952), affirmed 11 N.J. 418 (1953); 7 Wigmore on Evidence (3d ed. 1940), § 2090; McCormick on Evidence 28 (1954); 31 Am. Jur.2d, Expert and Opinion Evidence, § 16 (1967).
*500 In the absence of such expert testimony, the fact-finder is plunged into a morass of allegations without a concrete test by which to judge the conduct under attack. It is axiomatic that the nub of a finding of negligence is the existence of a standard of conduct and the violation of that standard. And if the factfinder in this area of police administration is ill-equipped to utilize a standard of conduct based upon common experience, he cannot reach the question of whether there was a violation of that standard without the expert testimony of one steeped in experience and knowledge in the field.

II
The City of Newark has a paid police force and therefore liability attaches for property "destroyed or injured" "by reason of a mob or riot." N.J.S. 2A:48-1. The plaintiffs assert that the proofs support the conclusion that "riots" took place in the City of Newark between July 12 and 17, 1967, and that property was destroyed or damaged by reason thereof.
In determining whether a riot or riots took place in the light of the evidence produced at trial, it is essential to establish first the meaning of the term "riot" as contained in the applicable legislation. This meaning must be gleaned from sources outside the particular section of the statute under which this action was instituted, since the legislation does not contain a definition of the significant term "riot."
The common law offense of riot has been defined as "a disturbance of the peace by three or more persons unlawfully assembled together and acting in a violent and tumultuous manner," or "an unlawful assembly that has developed to the stage of violence." State v. Lustig, 13 N.J. Super. 149, 151, 152 (App. Div. 1951).
Inherent in the commission of a riot is an unlawful assembly, which in turn has been defined to be "any gathering together of three or more persons, with intent to disturb the public peace, accompanied by some overt act or acts to *501 effect that intent." State v. Butterworth, 104 N.J. Law 579, 583, 58 A.L.R. 744 (E. & A. 1928).
Other courts have varied the definitional terms. In International Wire Works v. Hanover Fire Insurance Co., 230 Wis. 72, 283 N.W. 292, 293 (Sup. Ct. 1939), the court stated that a riot is "an assembly of individuals who commit a lawful or unlawful act in a violent or tumultuous manner, to the terror or disturbance of others." The leading case under the English Riot (Damage) Act, 49 and 50 Vict., c. 38, § 2, states the necessary elements of a riot to be the following:
"* * * (1.) number of persons, three at least; (2.) common purpose; (3.) execution or inception of the common purpose; (4.) an intent to help one another by force if necessary against any person who may oppose them in the execution of their common purpose; (5.) force or violence not merely used in demolishing, but displayed in such a manner as to alarm at least one person of reasonable firmness and courage." Fields v. Receiver of Metropolitan Police, [1907] 2 K.B. 853, 860.
Corpus Juris Secundum defines the term as follows:
"* * * a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner." 77 C.J.S. Riot § 1 (1952).
According to Blackstone,
"A riot is where 3 or more actually do an unlawful act of violence, either with or without a common cause or quarrel * * * or do any other unlawful act with force and violence * * * or even do a lawful act, as removing a nuisance, in a violent or tumultuous manner." 4 Blackstone Commentaries (3d ed. 1862), 152.
In 1 Russell on Crimes (9th ed. 1877), 376, a riot is the following:
"* * * a tumultuous disturbance of the peace by three persons or more, assembling together of their own authority, with an intent *502 mutually to assist one another against any who shall oppose them in the execution of some enterprise of a private nature, and afterwards actually executing the same, in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful."
Hawkins, Pleas of the Crown, defines a riot in this manner:
"A riot seems to be a tumultuous disturbance of the peace, by three persons (a) or more, assembling together of their own authority, with an intent mutually to assist one another, against any who shall oppose them, in the execution of some enterprise of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful." 1 Hawkins, Pleas of the Crown, c. 65, § 1 (1787).
Finally, according to the noteworthy case of People v. Judson, 17 N.Y.C.P. (11 Daly) 1 (C.P. 1849), there is a riot "whenever three or more persons, in a tumultuous manner, use force or violence in the execution of any design wherein the law does not allow the use of force * * *."
At this point it is useful to note the following appropriate comment made by a New York court in a civil riot act case after reviewing various definitions of the term "riot:"
"We should not be unduly governed or controlled by the application of technical rules or definitions, as in a criminal prosecution, but rather by a reasonable, fair, liberal, and, at the same time, prudent, interpretation of this remedial statute, imposing the obligation on the city on the one hand, and creating the right to compensation by the property owner on the other." Marshall v. Buffalo, supra, 64 N.Y.S., at p. 416.
A distillation of all the definitions of a riot contained in past precedents leads this court to the conclusion that a riot is simply a tumultuous disturbance of the peace by a group of three or more persons having a common purpose who act in concert to accomplish their purpose through force or violence.

*503 III
Although the city acknowledges that the foregoing quotations represent the classic definitions of a "riot" under common law precedents, it urges that the history of the legislation in New Jersey requires more rigid requirements of proof to qualify the disturbance as a riot for recovery of damages against the municipality.
The original legislation of 1864 (L. 1864, c. 150), which is the forerunner of N.J.S. 2A:48-1 to 7, was couched substantially in the same language as the current legislation. In the Revised Statutes of 1877, the Legislature combined all the acts dealing with mobs, riots and tumultuous assemblies, civil and criminal, into one statute entitled "An Act to Prevent Routs, Riots and Tumultuous Assemblies." Rev. 1877, p. 978, § 1 et seq.
Included in that act was a provision dealing with the duty of the sheriff and other peace officers to "read the riot act," i.e., to proclaim to those assembled to disperse under pain of criminal penalties (now N.J.S. 2A:126-4). Incorporated in this section is the provision that it applies only where there are 12 or more persons "armed with clubs, guns, swords or other weapons" or "any number of persons, consisting of thirty or more * * * unlawfully, routously, riotously, or tumultuously assembled * * *." Rev. 1877, § 1.
Paragraphs 2, 3 and 4 of the 1877 Revision provided, inter alia, for criminal penalties for those who fail to desperse after the reading of the riot act or who obstruct the officials from carrying out their duties. (Now N.J.S. 2A:126-5 and 7).
Paragraphs 5 to 11 of the 1877 Revision contained the civil provisions for compensation for damaged property now incorporated in N.J.S. 2A:48-1 to 7. The 1877 Revision was continued virtually unchanged in the Compiled Statutes of 1910, 4 C.S., p. 4380, § 1 et seq.
In 1923 the Legislature adopted an additional act entitled "An Act to Suppress Mob Violence" (L. 1923, c. 147) which *504 incorporated civil and criminal provisions. The criminal section of the 1923 statute found their way into the 1937 Revision and are presently designated as N.J.S. 2A:126-1, 2 and 3. Section 1 defines a "mob" as a collection of five or more individuals assembled for the unlawful purpose of offering violence to the person or property of one supposed to have violated the law, or for the purpose of exercising correctional powers over a person by violence. Sections 2 and 3 create criminal liability for those participating in a "mob."
The portions of the statute dealing with the civil right of action for damages against a municipality for death or injury to person or property at the hands of a "mob" were incorporated in the 1937 Revision, and now appear in N.J.S. 2A:48-8 and 9. State v. Algor, 26 N.J. Super. 527 (App. Div. 1953); Hailey v. City of Newark, 22 N.J. Misc. 139, 36 A.2d 210 (C.P. 1944). N.J.S. 2A:48-8 contains its own definitions of a "mob," which parallels the definition in the criminal sections of the act now set forth in N.J.S. 2A:126-1.
In all this legislation and revisions there is absent any effort on the part of the Legislature to define a "riot." The city contends that the terms "riot" and "mob" are synonymous and that the court should adopt the definition contained in N.J.S. 2A:126-1 or 2A:48-8 as the test of whether plaintiffs have proved the existence of a riot. This contention is based solely upon the fortuitous circumstance that all the statutes dealing with mobs and riots, both criminal and civil, were codified in one act in the Revision of 1877, and that by this comprehensive treatment the Legislature intended that the definition of a "mob" pervade all the sections of the statute involving mobs or riots.
Such a simplistic analysis has no real merit. The current statute which is pertinent to this litigation has no relationship physically or substantively with the statutory enactments involving the legislative definition of a "mob." Furthermore, the court cannot overlook the fact that the Legislature utilized two separate terms: mob or riot, and that every word *505 in a statute must be given significance. Fiscilla v. Nulton, 22 N.J. Super. 367, 372 (App. Div. 1952); Foy v. Dayko, 82 N.J. Super. 8, 13 (App. Div. 1964), certification denied 41 N.J. 602 (1964).
It is the court's conclusion that a "riot" is distinguishable from a "mob" and that the definition of a "riot" is not controlled by the statutory definition of a "mob". See Hailey, supra, at p. 142. Furthermore, it is manifest that plaintiffs have proceeded on the allegation of the existence of a "riot," and the evidence will therefore be judged by the elements of a "riot," and not by those of a "mob" as defined in the other statutes.

IV
Defendant also advances the argument that the statute granting civil recovery against a municipality should only be invoked in a situation where the rioters are a "specific identifiable group with a common objective directed against a specific property," and that the nature of the disturbances in Newark in July 1967 did not have these characteristics. There is no basis in precedent or logic to assume that the Legislature intended to engraft such refined limitations on the general definition of a riot; and this court therefore rejects the defendant's suggestion to that effect.
The mere circumstance that most of the fact situations arising in the past under civil riot statutes have involved damage caused to a particular property owned or controlled by the intended victim of the riot does not exclude the application of the statute to other types of disturbances that may occur in our society. It is immaterial whether the rioters have a common purpose of injuring or damaging a broad segment of society rather than an individual member thereof.
Similarly, it is of no significance whether there is a single, identifiable group or a number of riotous groups whose overall motivation is inflamed by one common purpose  to injure and destroy. And whether the riotous acts are *506 limited in physical scope to one property, one street, one section of the city, or are wide-spread throughout many areas of the city, is irrelevant.
"Where many individuals are acting separately, or in small parties distinct from each other, at different times and at different places, but manifestly for the same general purpose, as to break into a theater, or to injure it by the throwing of stones and missiles, or to resist or attack those who are there in authority to preserve the peace, it is not a series of affrays, but a general riot." People v. Judson, supra, 17 N.Y.C.P.R., at pp. 2-3, 11 Daly 1.
Finally, the city urges that the July 1967 disturbances represented a unique phenomenon  "an amorphous explosion"  arising out of sociological causes, which were not within the contemplation of the legislation granting civil recovery against the city. In essence, it asserts that the disturbances were so intense and widespread that they approached the characteristics of an insurrection and that the statutory cause of action was never intended to impose liability for such a holocaust.
Undoubtedly, if the damage to the property of plaintiffs was the result of a true insurrection or rebellion, the court would refuse to impose liability upon the city. It can be assumed that the legislation in question was never intended to create municipal responsibility for the results of a rebellion or insurrection. It is beyond reason to conclude that the Legislature intended to hold municipalities liable for the effects of that type of uprising.
However, the basic target or object of an insurrection or rebellion is established authority  government itself. 46 C.J.S. Insurrection and Sedition § 1 (1946). The participants in an insurrection combine for the avowed purpose of resistance to established government.
"Insurrection is distinguished from rout, riot, and offenses connected with mob violence by the fact that in insurrection there is an organized and armed uprising against authority or operations of government, while crimes growing out of mob violence, however serious they may be and however numerous the participants, are simply unlawful *507 acts in disturbance of the peace which do not threaten the stability of the government or the existence of political society." Id., at p. 1085.
The Newark disturbances, as revealed by the evidence, were not motivated by such a purpose and lacked the essential characteristics of an insurrection. If they did not fall into that extreme category, does the fact that the violence was intense or the damage extensive or the riotous activities widespread, distinguish the disturbances so that they are not to be designated as riots under the definition adopted by the court? Or does the fact that the disturbances arose out of socio-racial tensions, or that their object was white society, signify that they are not riots?
The court is of the firm opinion that these factors are not significant in determining whether there were riots within the intent of the applicable legislation. Riots exist under the adopted definition whether there is one or more of them, whether they are mild or intense, whether they affect one property or many, whether they are limited to one area or are widespread through the community, whether the cause is sociological or private pique, and whether the object is an individual, a group of individuals, or a broad segment of society.

V
The outbreak of the disorders took place during the night of Wednesday, July 12, in the area of the Fourth Precinct Police Station. A black taxi driver named John W. Smith had been arrested, brought to that station, and held in custody. Apparently, an unfounded rumor had spread that Smith had been beaten to death by the police. In consequence, a group of civil rights leaders appeared at the precinct to investigate the facts, and thereupon a large crowd of Negroes, ultimately numbering several hundred, assembled outside the precinct. They were milling about, uttering epithets at police officers, acting boisterously, and hurling rocks and stones at the precinct building and parked police cars.
*508 Although the arrest of Smith was the spark which ignited the disorders, it has been theorized that the latent causes arose out of deteriorating conditions in the Negro ghetto and frustration with the failure of established authority to correct them. In addition, there had been a few specific sources of irritation on the part of the black community, including the controversy over the location of the New Jersey College of Medicine with its accompanying dislocation of black residents, and the recommendation of a white councilman for the position of secretary of the Board of Education instead of a qualified Negro who had been proposed by whites and Negroes in the community. Moreover, the atmosphere and tensions were ripe for serious disorders, not only in the City of Newark but in many large cities throughout the nation.
Unquestionably, there were many causes, tangible and intangible, which brought about the events of July 12 to 17, 1967 in the City of Newark. Nevertheless, regardless of the causes, the initial manifestation of mob violence pertinent to this litigation occurred at the Fourth Precinct on July 12, as already described. In addition to the hurling of rocks and stones, someone threw a Molotov cocktail at the building. A woman Negro leader was exhorting the crowd to storm the precinct and enter it by force, while other Negro leaders urged the people to go home but "were interrupted when fire bombs were thrown at the precinct." Several policemen and firemen put out a fire in an abandoned car and were stoned as they left the area.
When a group of 20 to 25 policemen charged out the front door of the precinct, a portion of the crowd dispersed. However, a large group of teenagers, 60 to 75 in number, continued their activities in marching formation, throwing missiles at the precinct building. Ultimately, approximately 50 officers in four squads equipped with helmets and nightsticks left the station and patrolled the area. They were also harassed by missiles thrown by the teenagers from *509 time to time. Finally, the marchers were dispersed, and the crowd around the precinct was dissipated.
That same night, many store windows were shattered and a liquor store was looted in the area of the Fourth Precinct.
The daylight hours of Thursday, July 13, were relatively quiet. There was a wishful hope that the events of the night before were isolated incidents and that there was a return to normalcy. Meetings were held at City Hall to consider the demands and suggestions of Negro leaders and to map out plans for easing existing tensions.
It was learned late Thursday afternoon that leaflets had been distributed in the City stating:

"Stop! Police Brutality Come out and join us at the Mass Rally TONIGHT, 7:30 P.M. FOURTH PRECINCT"
By 6:45 P.M. a group of about ten persons had formed a picket line in front of the Fourth Precinct, and gradually the line grew larger. By 7:30 P.M. a crowd of 300 Negroes had gathered across the street. At about 8:00 P.M. a "heavy barrage of rocks, stones, bottles and pieces of wood and metal hit the front of the precinct, breaking several windows." The appearance of a group of 50 policemen with night sticks caused the crowd to flee. However, groups of 30 to 50 young teenagers in quasi-military formation continued to attack the building and the police with missiles and then run back, whereupon they would regroup and proceed with another assault. When more police reserves had been deployed to the Fourth Precinct, the assaults of these youngsters started to quiet down, but reports were coming in to the police of the spread of disorders to various other sections of the city.
Along Springfield Avenue there were crowds milling around  breaking store windows, removing and destroying metal gratings, entering business establishments and looting and vandalizing indiscriminately and as the night wore on, *510 the crowds became larger and the destruction and violence progressively worse.
This activity took place not only along Springfield Avenue and its various side streets, but also in the areas of South Orange Avenue, Clinton Avenue, Elizabeth Avenue and Bergen Street.
The terror was aggravated by bands of 10 to 15 persons, on foot and in cars, looting and starting fires. As testified by Deputy Chief Thomas M. Henry, as the police would approach a place where they had seen a group break in, they came under a barrage of gunfire and stones from nearby rooftops. Molotov cocktails, stones and bottles were common missiles used to prevent the police from performing their duty.
Scenes were frequent of windshields shattered on vehicles with white occupants, and of bloody injuries to citizens, police and firemen.
Ultimately four of the five precincts in the city were substantially involved.
In the words of Captain Christian J. Volz, it was "pretty wild"  it was a "riot." Captain Charles M. Zizza was patrolling in a police car going easterly on Springfield Avenue. The sight was described by him as "ten thousand animals going crazy"  rioting from 11th Street to Fairmount Avenue, smashing windows, looting and burning stores, turning over cars, attaching lines to steel gratings of store fronts and pulling them away to gain entrance. Bottles and debris were hurled from roof tops at the Hayes housing project.
By midnight there was rioting, burning and looting in four precincts of the city.
Other witnesses described the crowds as "mobile," going from store to store and followed by families who entered the stores and looted them indiscriminately. The crowds were extremely noisy and disorderly. As one witness observed, "It looked like wild herds of cattle. Hundreds of them in waves."
*511 Three specific incidents described by the victims are illustrative of the mood of the crowds and the mortal fear instilled by their violent conduct.
Dominick F. De Anthony owned a food store at 142 Peshine Avenue and lived in an apartment above the store. On Thursday night he looked out his window and saw many black people, estimated at 100 or so, "running like mad," damaging cars, breaking store windows and removing merchandise from stores, including his own. When he spoke up, some of the crowd yelled, "White man, get back or you'll be killed." Others were yelling, "Black power  Let's get Whitey." Shops in the area owned by Negro proprietors were not touched. Mr. De Anthony, in fear of his life, finally managed to get out of the area by lying on the floor of the car of a sympathetic black neighbor. When he went back the next day, he was again threatened by a group of teenagers who yelled, "Get out Whitey, we'll burn you down."
Frank Czyz was in his car in the area of Springfield Avenue and Morris Avenue on July 13 at about 9 P.M. He saw the mobs shouting, throwing bricks at stores and breaking store windows. A group of 15 or 20 surrounded his car so that he could not move. They broke the windows of the car and removed him, whereupon they proceeded to rip off all his clothes, take everything of value and "beat the hell out of him." He roamed around in this condition for a half hour until he was finally rescued by two priests who helped get him to a hospital.
Alexander Flax, who was employed in a baby furniture store which had been burned down, testified that as he drove down Springfield Avenue and up South Orange Avenue, he saw gangs with bars and sticks breaking store windows and removing merchandise. He also heard sounds of gunfire. When he ran for cover into a phone booth, 15 Negro youngsters stoned him from all sides yelling, "Come out, you white bastard, we'll kill you."
*512 In toto, the actions of the mobs in the various sections of the city were wholly out of control, there was mass violence and disorder, and the police were unable to cope with the situation. Finally, at approximately 2:30 A.M. of July 14, the responsible officials of the city decided that they needed outside assistance. It was at that time that the mayor called Governor Hughes for help, and the State Police and National Guard were dispatched to help restore order.
In the police report of the disorders it is noted that close to 100 persons were injured on July 14 between 3 and 5 A.M. as police and bands of Negroes fought a hit-and-run battle in the Central Ward and the downtown shopping area. As of that time approximately 2,000 persons became involved in more than a hundred incidents.
The same report points out the following:
"Throughout the day there was continuous rioting, acts of arson and sniper fire. Lotting [sic] was rampant. As evening approached the rebellion picked up momentum and fanned out into all directions. It was a repetition of the night before but with many more reprecussions [sic]. Sniper fire was taking its toll. The bands of looters were larger and it seemed that they were more organized. The constant fire alarms were too much for the Newark Fire Department to handle. It was open rebellion. It was street fighting. Guerilla tactics now took hold."
The State Police arrived in Newark on July 14 at 3 A.M. The National Guard came in the same morning, ultimately reaching a strength of 3,400 troops. In the State Police summary of the disorders, it is pointed out that the riot area contained approximately 12 square miles, about two-thirds of the total residential and commercial area of the city.
Superintendent David B. Kelly of the State Police was in the city from July 13 to 17. His observations revealed many fires and much looting. He toured the city in the early morning of July 14 with the Governor, Mayor and Newark Police Director, and saw crowds of boisterous and *513 hilarious people in groups of 20 to 50. There was a "carnival" atmosphere.
The troubled areas were sealed off by the State Police and National Guard and efforts were commenced to get the crowds off the streets. In addition to the problems arising from destruction, breaking and entering, looting, stoning, and burning, the police and guard troops were faced with an additional danger consisting of many incidents of sniper fire from apartment buildings and roof tops. Firemen who were attempting to fight fires were also harassed by snipers and hurlers of missiles and required police protection to carry on their labors.
On July 14 the Governor of the State was compelled to declare a state of emergency in a proclamation which recited the existence of "a state of disaster in which acts of homicide, violence, looting and burning are prevalent." He also issued a set of regulations controlling activities in the city, including a night curfew. The state of emergency remained in effect until July 17 at 3 P.M.
The violence tapered off on July 15 with the presence of State Police and National Guard troops who sealed off the riotous areas, although looting and sniper fire continued. By Sunday, July 16, the violence and tensions seemed to ease in the city, and on July 17 conditions were completely under control, so that the emergency was terminated; and on July 18 businesses and schools were open again.
The many photographs and lengthy motion pictures introduced in evidence graphically depicted some of the activities of the rioters and the State Police and National Guard and the extensive damage which resulted from the few violent days.
The statistical aftermath reveals the following:
24 persons killed
1200 persons injured
1029 businesses establishments damaged
29 residences damaged
62 major fires
*514 24 sniper incidents reported
Total arrests: approximately 1500
Many confiscated weapons, including revolvers, rifles, shotguns and knives

Conclusions
In consideration of all the evidence and the reasonable inferences therefrom, the court finds that there were many tumultuous disturbances of the peace in the Central, South, West and North Wards of the City of Newark between July 12 and 17, 1967. These disturbances involved groups of black persons in varying numbers in excess of three, who used force and violence to accomplish the common purpose of the militant blacks in a racist upsurge to destroy and injure the property of the white segment of the community. Although the disorders took place in various sections of the city and involved different mobs and bands, nevertheless they were all part of a cohesive movement wherein one group was inspired by and gained courage from other groups. And through the psychological and physical support of large menacing numbers, many individuals were enabled to set fires, to destroy, to enter and to loot with impunity.
The court finds from the overwhelming undisputed evidence that these disorders constituted a general "riot" or a series of "riots" within the reasonable meaning and intent of the applicable legislation, and that these "riots" caused untold damage to real and personal property through fires, physical destruction, pillaging and looting.
These findings bring to a close the proceedings in the consolidated cases so far as they can be determined on common issues of fact and law. Henceforth, the individual cases will be set down for hearing on the remaining issues of damages and causal relationship between the riots and the damages. At those hearings, the city may assert the statutory defenses involving contributory negligence and notice requirements to the extent that they may be supported by evidence applicable to any of the particular claimants.