310 So.2d 19 (1975)
FLORIDA FIRST NATIONAL BANK OF JACKSONVILLE, As Guardian of the Property of Ernest John Dobbert, III, a Minor, Appellant,
v.
The CITY OF JACKSONVILLE, Florida, a Municipal Corporation, and Transportation Insurance Company, a Corporation, Appellees.
FLORIDA FIRST NATIONAL BANK OF JACKSONVILLE, As Guardian of the Property of Honore Elizabeth Dobbert, a Minor, Appellant,
v.
The CITY OF JACKSONVILLE, Florida, a Municipal Corporation, and Transportation Insurance Company, a Corporation, Appellees.
Nos. S-489, S-490.
District Court of Appeal of Florida, First District.
March 20, 1975.
Rehearing Denied April 16, 1975.
*20 Nathan Bedell, Robert P. Smith, Jr., and William C. Gentry, of Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, for appellant.
Marion R. Shepard, of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, for appellees.
BOYER, Acting Chief Judge.
By these consolidated appeals we are asked to review final judgments of dismissal wherein the learned and able trial judge dismissed with prejudice the amended complaints filed by the plaintiff.[1] The broad issue before us is the propriety of those dismissals. It is axiomatic that in passing upon a motion to dismiss a complaint or amended complaint the trial judge is confined to a consideration of the allegation thereof in the light of applicable substantive law.[2] The narrower issue to be here resolved is whether the appellee municipality may be held legally liable for the damages sustained by appellant's wards under the holdings of the Supreme Court of Florida in Hargrove v. Town of Cocoa Beach, Sup.Ct.Fla. 1957, 96 So.2d 130, as explained and clarified by Modlin v. City of Miami Beach, Sup.Ct.Fla. 1967, 201 So.2d 70, and Wong v. City of Miami, Sup. Ct.Fla. 1970, 237 So.2d 132. We hold that it may, and reverse.
In the landmark case of Hargrove v. Town of Cocoa Beach, supra, the Supreme Court said:
"* * * Affirmatively we hold that a municipal corporation may be held liable for the torts of police officers under the doctrine of respondent superior.
* * * * * *
"* * * we here merely hold that when an individual suffers a direct, personal injury proximately caused by the negligence of a municipal employee while acting within the scope of his employment, the injured individual is entitled to redress for the wrong done." (96 So.2d 130, 133; footnotes omitted)
In Modlin v. City of Miami Beach, supra, decided 10 years after Hargrove, the Supreme Court carefully explained, and to some degree limited the application of, Hargrove, saying:
"* * * we deem it advisable to attempt to define more clearly the boundary of remaining municipal tort immunity.
* * * * * *
"* * * The tort liability of municipal corporations may now be equated with that of private corporations.
* * * * * *
"The Hargrove specification of the legislative and judicial functions as constituting the area of continuing immunity obviously implies that the performance of the executive or administrative function will constitute the area of potential liability. * * *" (201 So.2d 73; emphasis added)
We find therefore from Hargrove and Modlin that a municipality may be held liable for the torts of its employee *21 while acting within the scope of his employment in the performance of executive or administrative functions under the doctrine of respondeat superior, equating that liability with that of private corporations.
The writer of the Modlin opinion carefully distinguished between legislative, administrative, judicial and executive functions. As will be seen from an application of the guidelines there established, the function of the employees of the appellee municipality in the case sub judice was clearly executive.[3]
Since the liability of the municipality is based on the doctrine of respondeat superior, it follows that we must now inquire whether the city employees whose negligence is alleged by appellant to have given rise to a cause of action against their employer would have themselves been liable in tort in the circumstances of this case.[4] In making that determination we must again harken back to Modlin and the authorities therein cited. There we learn that a fundamental element of actionable negligence is the existence of a duty owed by the person charged with negligence to the person injured and that this duty must be something more than the duty which is owed to the public generally. In order for a municipality to be held liable for the acts or omissions of its employee the plaintiff must allege and prove that he has sustained some special or peculiar damage different from that sustained by the public generally and that the injury or damage resulted from a breach of a duty owed by the employee to the plaintiff as distinguished from the public generally.[5]
Following Hargrove, Florida courts have experienced no difficulty in placing a duty of care on a municipality which undertakes the manual operation of a railroad crossing signal toward a motorist attempting to negotiate that crossing[6] or in placing on police officers a duty not to deprive those with whom they come in contact of their constitutional rights of privacy, integrity of person, and so forth.[7]
We turn now to the factual situation alleged in the amended complaints in the cases sub judice.[8] *22 *23 *24
*25 Our first inquiry is whether the amended complaint alleges negligence on the part of municipal employees. We find that it does. Second, had the municipal employees been instead the employees of a private corporation would their negligence have imposed liability upon their private corporate employer? We find that it would.[9] Third, did the plaintiff suffer a special personal damage not common to the community?[10] There can be no question but that under the allegations of the amended complaint it did. Fourth, at the time of the alleged negligence on the part of the municipal employees did they owe a duty to the wards of the plaintiff in any way different from that owed to any other member of the public?[11] We find that they did and that therefore, although we here rely on Modlin, the case sub judice is in that manner distinguishable.
In Modlin, the negligent municipal employee had undertaken no special duty nor responsibility to Mrs. Modlin not common to the public in general and there was no reliance by Mrs. Modlin, apart from her *26 membership in the general public, on the activities the negligent performance of which resulted in her death. Such is not the situation in the cases sub judice. Here, the municipality, through its employees, engaged in an undertaking with reference to the Dobbert children. Other persons[12] all of whom were in positions to have gone to the aid of the Dobbert children but for their reliance upon the municipal employees[13] refrained from rendering aid.
These cases are in no manner analogous to Wong v. City of Miami, supra. That case simply held that the soverign authorities ought to be left free to exercise their discretion and chose the tactics deemed by them appropriate without worry over possible allegations of negligence and that inherent in the right to exercise police powers is the right to determine strategy and tactics for deployment of those powers, particularly in times of civil unrest.[14]
Distinguishable also is Steinhardt v. Town of North Bay Village.[15] There the writer of the opinion observed:
"* * * In the instant case the plaintiffs do not complain of the negligence of a municipal employee but of the failure to properly provide a city service." (132 So.2d at page 767)
Appellee next cites us to Evett v. City of Inverness.[16] That case falls squarely within the Modlin holding, in that, as the writer of that opinion concluded:
"* * * If he [the police officer] did negligently permit the intoxicated driver to continue operating his vehicle on the public highway, he still owed no duty to plaintiff's deceased husband in any way different from that owed to any other member of the public. Therefore, as the police officer is not liable, the city cannot be liable under the rule of respondeat superior." (224 So.2d at pages 336-337)
The distinguishing characteristic of Evett is therefore, as reflected by the above quotation, apparent. There was no privity nor direct relationship nor contact between the city's employee and the damaged party, nor was there any different nor particular duty owed to the damaged party in any way different from that owed to any other member of the public. As above demonstrated such are not the facts sub judice.[17]
Finally, we are cited to Henderson v. City of St. Petersburg.[18] However, that decision is not controlling for at least two different reasons. First, that case is factually more similar to Wong, supra, and Riss, supra, involving the use and deployment of police.[19] Second, and perhaps more important, as stated in the opinion itself, the amended complaint there dismissed did not allege any causal connection between the alleged negligence of the city and the damages sustained by the plaintiff. Neither did it allege that the city owed the plaintiff any "special duty".
*27 In the case sub judice the municipal employees undertook aid to the plaintiff's wards, other responsible citizens relied upon that undertaking, the municipal employees negligently performed (or failed to perform) and those specific children, as distinguished from the public in general, were damaged.
In the final judgments here appealed, the learned trial judge recited a finding "that the allegations in the complaints failed to show that the defendants owed a special duty to the children named in said complaints, but that the duty owed said children was no different from the general duty owed to all children in the community". We conclude that, based upon the allegations of the amended complaints, that finding was error, and that the amended complaints stated a cause of action under the law of the State of Florida.[20]
Reversed.
JOHNSON and MILLS, JJ., concur.
NOTES
[1] The two cases were filed by the Florida First National Bank of Jacksonville in its capacity as guardian of two minor children, the suits having arisen out of the same factual circumstances and the alleged damages to each of the minor wards having been substantially the same. The cases were consolidated in the trial court and a single final judgment of dismissal was entered.
[2] Dawson v. Blue Cross Association, Fla.App. 1st 1974, 293 So.2d 90; Thomas v. Rollins, Fla.App.1st 1974, 298 So.2d 186; and Bradham v. Hayes Enterprises, Inc., Fla.App.1st 1975, 306 So.2d 568.
[3] The Modlin opinion is carefully worded and the guidelines established by the Supreme Court of Florida are there set forth. Nothing would be accomplished by paraphrasing nor quoting those guidelines verbatim here.
[4] See 21 Fla.Jur., Master and Servant, § 76 and Modlin v. City of Miami Beach, supra.
[5] Modlin v. City of Miami Beach, supra, 201 So.2d at page 75 and the numerous authorities there referred to.
[6] Hewitt v. Venable, Fla.App.3rd 1959, 109 So.2d 185.
[7] Thompson v. City of Jacksonville, Fla.App. 1st 1961, 130 So.2d 105; Simpson v. City of Miami, Fla.App.3rd 1963, 155 So.2d 829, cert. discharged, Sup.Ct.Fla. 1965, 172 So.2d 435; Fisher v. City of Miami, Fla.App.3rd 1964, 160 So.2d 57; City of Hialeah v. Hutchins, Fla.App.3rd 1964, 166 So.2d 607; Shipp v. City of Miami, Fla.App.3rd 1963, 172 So.2d 618; Evanoff v. City of St. Petersburg, Fla. App.2d 1966, 186 So.2d 68.
[8] The allegations of the two complaints are substantially the same. The acts and omissions alleged as furnishing a foundation for a cause of action against the appellees being so numerous, we quote here verbatim one of the amended complaints. Inasmuch as the allegations of both amended complaints are substantially the same, in the interest of brevity only one amended complaint is quoted. "The plaintiff, Florida First National Bank of Jacksonville, as guardian of the property of Ernest John Dobbert, III, a minor, sues the defendants The City of Jacksonville, Florida, a municipal corporation, and Transportation Insurance Company, a corporation, and alleges:

"1. The plaintiff, Florida First National Bank of Jacksonville, is guardian of the property of Ernest John Dobbert, III, (hereinafter referred to as John) a minor, by virtue of letters of guardianship issued by the County Judge of Duval County, Florida on the 6th day of June, 1972.
"2. The defendant, City of Jacksonville, Florida, (hereinafter referred to as the City) is a municipal corporation located in Duval County, Florida, created and existing under the laws of the State of Florida. The defendant, Transportation Insurance Company, is a corporation incorporated under the laws of the State of Illinois, and at all times herein alleged was, and is now, licensed to do business in the State of Florida.
"3. At all times material to this action, the defendant Transportation Insurance Company insured the City under a liability insurance policy, which policy was written for the benefit of third persons who might suffer injuries by virtue of the negligence of the City, its agents or employees, and at the time of the events herein alleged such policy inured to the benefit of John and the guardian of his property, Florida First National Bank of Jacksonville.
"4. Prior to November 1969 John lived with his natural parents, Ernest John Dobbert, Jr., (hereinafter referred to as Dobbert) and Virginia Dobbert (hereinafter referred to as Mrs. Dobbert) and his brother, Ryder Scott, and two sisters, Kelly Ann and Honoree Elizabeth, in the State of Wisconsin. While in the State of Wisconsin, on or about September 21, 1965, Dobbert was convicted for battery of John, Kelly and Mrs. Dobbert, and on March 20, 1968, Dobbert was convicted of abusing John.
"5. At all times hereinafter mentioned the minor child, John, was a resident of the City of Jacksonville, Florida. John and his brother and sisters resided with one or both of their parents on Oliver Street from June 1970 until April 1971, and with Dobbert at 4119 Adirolf Avenue from April 1971 until April 1972.
"6. About January 21, 1971, Mrs. Dobbert was arrested for knowingly issuing worthless checks. She was incarcerated in the Duval County jail for a short time and then transferred to the Jacksonville City Prison Farm. Although the charges were dismissed, she remained at the Prison Farm until late July 1971 when she was extradited to Wisconsin to face similar charges.
"7. At all times mentioned herein the defendant City of Jacksonville, Florida, was under a duty to protect and keep minor children residing or present within the municipality, safe from abuse and maltreatment and in the performance of that duty was obliged to respond to reports of child abuse or neglect in accordance with the following accepted and established Police procedures:
"a. to make a prompt and thorough investigation of all reports of child abuse including:
"(1) a physical examination of each child in the family;
"(2) an interview with each child in the family;
"(3) an interview with each parent;
"(4) a complete check of the condition of the house;
"(5) an interview with the person who made the report or complaint; and
"(6) a review of the police and juvenile court records concerning prior complaints of child abuse;
"(b) to make a report of each investigation of an alleged instance of child abuse or neglect and to file a copy of that report with the juvenile court prior to July 1, 1971 and subsequent to that date to file a copy of the report with the State of Florida Department of Health and Rehabilitative Services pursuant to Florida Statutes § 828.041; and
"c. to take into immediate custody and bring before the juvenile court for protection, care and treatment any child with marks or bruises indicating abuse or mistreatment, or whose environment was such that the welfare of the child required that the child be taken into custody.
"8. In or about November 1970, Mrs. Dobbert reported to the Police Division of the Sheriff's Office of the City of Jacksonville (hereinafter referred to as the Police) that Dobbert was severely beating John and requesting assistance for the child. When the police arrived at the house on Oliver Street where Dobbert had been beating John, Dobbert had left the premises with John and the other children. The police made no attempt to locate Dobbert or the children, terminated their investigation and made no report of the incident.
"9. On numerous occasions between April 17, 1971 and April 1972 the Police received reports of child abuse and requests for assistance on behalf of John and the other Dobbert children, and in furtherance of its duty to protect and keep minor children residing or present within the municipality safe from abuse and mistreatment, the defendant City of Jacksonville, by and through its agents and employees, undertook and assumed a special duty to aid John individually and to prevent his further abuse, but in each instance the City, through its agents and employees, negligently failed to use reasonable care in performing their investigation, failed to follow the aforesaid accepted and established procedures for investigating reports of child abuse and failed to make a proper report, as hereinafter more fully appears:
"a. On or about April 30, 1971 Sergeant Anne Hancock, head of the Youth Investigation Division of the Police, received a call from a neighbor of Dobberts informing her that children residing at 4119 Adirolf Avenue were being neglected and abused and requesting Police assistance. In response to that request, Sergeant Hancock telephoned the Police uniformed division and requested an investigation. Pursuant to Sergeant Hancock's call, Patrolman T.L. Welch went to the Dobbert house and was met at the door by Dobbert. He talked to Dobbert about five minutes and informed him of the complaint regarding child abuse. He observed John briefly and saw no outward signs of abuse. Patrolman Welch failed to use reasonable care in conducting his investigation in accordance with the accepted and established Police procedures and failed to make a report of the investigation.
"b. On or about June 24, 1971 a neighbor of Dobberts, Mr. B.F. Turlington, telephoned the Police and informed them that John and his brother and two sisters had been beaten and abused by Dobbert, and that John had been observed with cuts and sores on his back caused by such beatings. He further stated that the children had experienced beatings and abuse from their father on several previous occasions, and requested immediate Police assistance. In response to the call, Patrolman J.D. Gallups went to the Dobbert house where he talked to Dobbert on the front porch and observed John and the other Dobbert children. Patrolman Gallups failed to use reasonable care in the performance of his duties and failed to conduct his investigation in accordance with the accepted and established Police procedures. Although he saw that John had bruises around his eye, he failed to make a physical examination of John or the other children. Had he exercised reasonable care and made a physical examination of John, he would have found that his back was infected as a result of repeated beatings, that he had bruises about his ribs from repeated beatings, and that his arm was improperly healing from a prior injury suffered as the result of abuse at the hands of Dobbert. Such an examination and findings, under the circumstances, would have required that Patrolman Gallups take John and the other children into immediate protective custody and would have prevented John from suffering subsequent abuse and mistreatment which he thereafter experienced. Patrolman Gallups made no report of his investigation and noted on his daily log that the child abuse call was `not a bona-fide incident.'
"c. Subsequent to Patrolman Gallups' investigation, a neighbor of the Dobberts, Mrs. Vera Tillis, reported to the Honorable Marion W. Gooding, Judge of the Circuit Court of Duval County, that Dobbert had been beating John and the other children and requested Judge Gooding's assistance. Immediately, Judge Gooding telephoned the Police and requested they investigate the report of child abuse at 4119 Adirolf Avenue. In response to Judge Gooding's request, police officers went to the above address and were met outside by Dobbert. They failed to go into the house or examine John or the other children in accordance with the accepted and established Police procedures and they failed to make a report of the incident. Had the Police exercised reasonable care and made a physical examination of John, they would have found that his back was infected as the result of prolonged and repeated beatings, that he had bruises about his ribs and was otherwise injured and such a finding, under the circumstances, would have required the Police to take John and the other children into immediate protective custody and would have prevented John from suffering the subsequent abuse and mistreatment he thereafter experienced.
"d. On or about June 24, 1971 while Mrs. Dobbert was incarcerated at the City Prison Farm, she informed Police Sergeants Eversole and Bacon and Chief Fred W. Murray, Jr. that she feared for the safety of John and her other minor children, that Dobbert had been known to beat and abuse the children in the past and requested that the Police investigate the condition of the children. Pursuant to her request, Chief Murray telephoned Sergeant Hancock of the Youth Division and related to Sergeant Hancock the information given him by Mrs. Dobbert, including the fact that Dobbert had been known to beat the children in the past. He requested that Sergeant Hancock make an investigation. Pursuant to Chief Murray's request, Sergeant Hancock or her assistant in the Youth Division, Sergeant Vought, telephoned the uniformed division and requested a patrolman be sent to investigate.
"e. On June 25, 1971 Patrolman W.F. Revels went to the Dobbert house and upon opening the front door saw John hiding under a table in the living room. Finding no parents at home, he left the residence without examining John or the other children, but he did observe that John had abrasions on the right side of his chest, dark circles under his eyes and a pale complexion. Patrolman Revels telephoned the Youth Division and the Juvenile Court in an attempt to determine whether prior reports of complaints or investigations concerning child abuse with regard to these children were on file. Had such reports been on file, including reports of the prior investigations heretofore mentioned, Patrolman Revels would, in accordance with the accepted and established Police procedure, have taken John and the other children into immediate protective custody and would have therefore prevented John from suffering subsequent abuse and mistreatment which he thereafter experienced. Finding no prior reports of complaints or investigations concerning the Dobbert children, Patrolman Revels made a report of his investigation and noted in his report the marks he had seen on John. A copy of that report was forwarded to the Youth Division of the Police for a follow-up investigation.
"f. On or about June 25, 1971 Investigator Melvin D. Miller of the Youth Division was given a copy of Patrolman Revels' report and assigned to investigate the condition of the Dobbert children. On or about June 28, 1971 Investigator Miller and Policewoman Joy R. Hotze visited the Dobberts' next door neighbors, Mr. and Mrs. C.L. Williams, to inquire about the condition of the children. Mr. and Mrs. Williams informed Investigators Miller and Hotze that the children were kept inside the house almost constantly, that the three older children had not been in school during the school term, that they had often heard Dobbert beat the children harshly and that they had observed Dobbert in anger throw John up against the outside of the house. Nevertheless, on that date Investigators Miller and Hotze did not visit the Dobbert house nor examine John or the other Dobbert children, nor make a report of their investigation.
"g. Investigator Miller took no further action with regard to the Dobbert children until July 7, 1971 when he visited Dobbert at his place of business. Thereafter Investigator Miller took John into custody and interviewed him in his patrol car outside the Dobbert house. During the period John was in custody, Investigator Miller failed to use reasonable care in conducting his examination in accordance with the accepted and established Police procedures and failed to make a physical examination of John, although he then had in his possession Officer Revels' report which indicated that on June 25, 1971 a neighbor had informed Officer Revels that the Dobbert children had been seen in the neighborhood with bruises about their bodies and that he himself on that occasion had observed abrasions on John's chest and dark circles under his eyes. Had Investigator Miller exercised reasonable care under the circumstances and conducted a physical examination of John, he would have found numerous abrasions sustained as the result of severe beatings about his chest, back, buttocks and other places about his body, arms and legs and such findings would have required that he take John into immediate protective custody and would have prevented John from suffering the subsequent abuse and mistreatment he thereafter experienced. Investigator Miller likewise, failed to properly examine the other Dobbert children and failed to file a copy of his report with the Department of Health and Rehabilitative Services of the State of Florida.
"h. On or about July 18, 1971 Mrs. Dobbert informed Chief Murray that her son Ryder had been admitted to the Jacksonville Memorial Hospital and that she feared that it was the result of abuse administered by Dobbert. Chief Murray notified Sergeant Hancock and asked that she investigate. Pursuant to Sergeant Hancock's instructions, Investigators Miller and Hotze went to Memorial Hospital on July 19, 1971 and interviewed and examined Ryder. He told them that he had been injured when he had fallen off a truck. Investigators Miller and Hotze terminated their investigation and informed Chief Murray that Mrs. Dobbert's fears were unfounded. Investigators Miller and Hotze failed to examine the emergency room and admission records which were then available to them and which showed that Ryder had been admitted to the hospital by Dobbert on July 12, 1971 and that various inconsistent reports had been given as to the cause of Ryder's injuries. They likewise failed to consult the police report filed by Patrolman K.D. Walder on July 12, 1971 which indicated that Ryder had sustained his injuries by falling from his bed. Investigators Miller and Hotze terminated their examination without going to the Dobbert house and without attempting to interview Dobbert, Mrs. Dobbert or any of the children in accordance with accepted and established Police procedures. Had investigators Miller and Hotze exercised reasonable care and followed the accepted and established Police procedures they would have discovered the discrepancies in the hospital records and the various inconsistencies between those records, the information given them by Ryder, Patrolman Walker's prior police report, and Investigator Miller's own findings five days prior to Ryder's admission. Had Investigators Miller and Hotze exercised reasonable care under the circumstances, visited the Dobbert house and conducted an examination of John and the other children in accordance with the accepted and established Police procedures, they would have found that John then had numerous abrasions about his chest, back and other parts of his body and such examination would have required that they take John into immediate protective custody and would have prevented John from suffering the subsequent abuse he thereafter experienced. Investigators Miller and Hotze failed to file a copy of the report with the Department of Health and Rehabilitative Services for the State of Florida.
"10. Subsequent to the aforementioned incidents, and up until April 8, 1972 when John escaped from his home and was picked up and taken to the Juvenile Emergency Care and Protection Center John was subjected to severe beatings and other abuse by Dobbert and suffered great physical pain, mental anguish and injury which he would not have otherwise suffered had the defendant City of Jacksonville, after having undertaken a special duty toward John, exercised reasonable care in making a proper investigation and examination in accordance with accepted and established Police procedures.
"11. The City, through its agents and employees, negligently, carelessly and with callous disregard for John's safety and wellbeing, failed in one or more of the following respects to use reasonable care in the performance of the special obligation undertaken in his behalf:
"a. in failing to heed or give credence to the numerous reliable reports that Dobbert had been abusing John and each of the other children;
"b. in failing to make a proper investigation and examination of John and the other Dobbert children;
"c. in failing to take appropriate measures to determine whether the reported abuses had, in fact, occurred;
"d. in failing to make a report of each investigation;
"e. in failing to file a report of each investigation with the juvenile court prior to July 1, 1971, and with the State of Florida Department of Health and Rehabilitative Services pursuant to Florida Statutes § 828.041 subsequent to July 1, 1971;
"f. in failing to protect John from further abuse by taking him into immediate custody as established procedure required when a proper examination would have revealed that he had been abused and mistreated; and
"g. in failing to make appropriate inquiry into Dobbert's prior criminal record, which record was readily available to investigating officers and which would have disclosed Dobbert's established propensities for engaging in child abuse.
"12. The City, by and through its agents and employees, undertook to investigate the reports that Dobbert was abusing and maltreating John and the other Dobbert children and to take remedial action. Pursuant to such undertaking the City's agents and employees made numerous visits to the Dobbert home yet negligently failed to protect John and the other children from such abuse. The various persons reporting the incidents of abuse to the City relied upon the Police to take appropriate action, and as a result of such reliance did not make reports to other governmental agencies which were available to take appropriate action.
"13. Subsequent to the City's assumption of a special duty to aid and protect John from further abuse and as a direct and proximate result of the aforesaid negligence of the City, its agents and employees, John was subjected to inhuman physical and other abuse and suffered multiple broken bones, multiple larcerations, contusions and burns and massive soft tissue and cartilage damages; he has suffered permanent impairment of his hearing, permanent impairment of vision, permanent disfigurement, brain damage, and permanent psychiatric and mental disturbance; he was subjected to constant beatings and torture and suffered unconscionable pain and mental anguish and mental and physical fatigue; and he will suffer pain, mental anguish, embarrassment and psychiatric and mental disturbance in the future; he has required and will require extensive medical and psychiatric treatment and therapy; and he is permanently disabled, his earning capacity has been permanently impaired, and he has been deprived of the opportunity to lead a normal life. * * *"
[9] For somewhat analogous cases brought under the Federal Torts Claim Act, see United States v. DeVane (5th Cir.1962), 306 F.2d 182 and United States v. Gavagan (5th Cir.1960), 280 F.2d 319.
[10] City of Tallahassee v. Fortune, Sup.Ct. Fla. 1850, 3 Fla. 19; Hargrove v. Town of Cocoa Beach, supra; Modlin v. City of Miami Beach, supra.
[11] Modlin v. City of Miami Beach, supra. See also rationale of United States v. DeVane, supra, and United States v. Gavagan, supra.
[12] Circuit Judge Marion Gooding, the juvenile authorities and various neighbors.
[13] United States v. DeVane, supra; and United States v. Gavagan, supra.
[14] Similar is Riss v. City of New York, Ct. App.N.Y. 1968, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 where that court said "The amount of protection that may be provided is limited by the resources of the community and by a considered legislative-executive decision as to how those resources may be deployed." (293 N.Y.S.2d at page 898, 240 N.E.2d at page 860). Even the writer of that decision apparently had in mind cases similar to those sub judice, saying: "Quite distinguishable, of course, is the situation where the police authorities undertake responsibilities to particular members of the public and expose them, without adequate protection, to the risks which then materialize into actual losses * * *." (293 N.Y.S.2d at page 899, 240 N.E.2d at page 861).
[15] Fla.App. 3rd 1961, 132 So.2d 764, cert. dis. Sup.Ct.Fla. 1962, 141 So.2d 737.
[16] Fla.App.2d 1969, 224 So.2d 365, cert. dis. Sup.Ct.Fla. 1970, 232 So.2d 18.
[17] A virtually identical situation existed in City of Tampa v. Davis, Fla.App.2d 1969, 226 So.2d 450, which is distinguished on the identical basis.
[18] Fla.App.2d 1971, 247 So.2d 23, cert. den. Sup.Ct.Fla. 1971, 250 So.2d 643.
[19] See also A & B Auto Stores of Jones St., Inc. v. City of Newark, Super.Ct. of N.J. 1969, 106 N.J. Super. 491, 256 A.2d 110.
[20] We are not here, of course, concerned with proof, but merely with the allegations of the amended complaints.